UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

JOSIY VIERA and JAMES GOSSELIN,      :

                      Plaintiffs,    :    15 Civ. 5430 (PGG)(HBP)

    -against-                        :    REPORT AND
                                          RECOMMENDATION
THE CITY OF NEW YORK and RICHMOND    :
UNIVERSITY MEDICAL CENTER,
                                     :
                      Defendants.
                                     :
----------------------------------X

          PITMAN, United States Magistrate Judge:

          TO THE HONORABLE PAUL G. GARDEPHE, United States

District Judge,

I.   Introduction

          The Honorable Paul G. Gardephe, United States District

Judge, has referred this matter to me to resolve plaintiff James

Gosselin's motion to withdraw his claims with prejudice pursuant

to Fed.R.Civ.P. 41(a)(2) (Docket Item ("D.I.") 64).  For the

reasons set forth on the recordings of two conferences I held in

this matter on July 15 and 29, 2016 and the additional reasons

set forth below, I respectfully recommend that Gosselin's motion

to dismiss be granted subject to certain conditions set forth

herein.

II.  <u>Facts</u>

The complaint alleges the following facts.

Plaintiff Josiy Viera is a deaf individual who communi-
cates primarily through American Sign Language ("ASL").  At all
relevant times, she has resided with her fiancé, James Gosselin,
with whom she is raising eight children.

On or about December 1, 2014, Gosselin fell while
holding his infant son, A.G., and Gosselin, Viera and A.G. went
to Richmond University Medical Center's ("RUMC's") emergency
department for evaluation and treatment.  The complaint alleges
that RUMC "failed to provide an ASL interpreter for Ms. Viera,
and thereby failed to ensure effective communication with her in
a medical setting, by ignoring or denying her requests for
accommodation on an ongoing basis during her son A.G.'s medical
treatment" (Complaint, (D.I. 1) ("Compl.") ¶ 2).  RUMC diagnosed
A.G. with a broken leg and referred him to New York-Presbyterian
Hospital for further treatment.

Subsequent to the events of December 1, 2014, employees
of New York City's Administration for Children's Services ("ACS")
visited Viera and Gosselin on several occasions, apparently to
check on the safety of their children.  According to plaintiffs,
"[e]xcept for one instance, ACS never brought an ASL interpreter

[to] these meetings, despite requests from both Ms. Viera and Mr. Gosselin.  Ms. Viera was unable to communicate with the ACS agents, and felt helpless and terrified that her children would be taken from her" (Compl. ¶ 3).

Plaintiffs commenced this action alleging that the failure of both RUMC and ACS to provide an ASL interpreter violated the Americans with Disabilities Act, 42 U.S.C. §§ 12101 et seq.; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794; New York's Human Rights Law, N.Y. Exec. L. §§ 290 et seq. and New York City's Human Rights Law, N.Y. Admin. Code §§ 8-101 et seq.

Defendants deposed Gosselin concerning the foregoing alleged events.  In response to defense counsel's questioning, Gosselin testified to an illustrious and valiant military history.  Gosselin testified that he served in the United States Army for ten years and was attached to Echo Company of the 75th United States Rangers Special Forces unit out of Fort Benning. He further testified that he served three tours in Iraq, two tours in Afghanistan and one tour in Egypt.  He claimed to have served as a combat medic and a backup scout sniper.  Gosselin also gave the following testimony:

> Q.   Did you receive any awards from the military?
>
> A.   Yes.

3

Q.   What did you receive?

A.   A Silver star and a Purple Heart.  Good Service
     Merit from the State of Connecticut.  Good Service
     Merit good [sic] from the State of Louisiana for
     helping with Katrina.  Good Service Merit from
     North Carolina.

Q.   What is the Silver Star awarded for?

A.   Bravery and heroism.

Q.   When did you receive that award?

A.   2004.

Q.   And can you just tell me a little about the --

A.   I am not going to relive that, sorry.  We were in
     the battlefield.  It was a very nasty time.

Q.   I just want to know basics.  What country were you
     in?

A.   Iraq.  I saved a guy's life.  It is no disrespect
     towards you.  I just don't want to relive that.

Q.   I understand.  That's fine.

     In 2004 when you received the award, where were
     you when you actually received the award?

A.   I was given it in Fallujah at the Air Force base,
     a little temporary Air Force base that they had
     there.  I officially got my documentation whenever
     I came back to Fort Jackson, South Carolina right
     at the beginning of 2005.

(Gosselin Dep. at 20-21).  Gosselin went on to claim that while

on active duty he was shot 14 times in both legs, that his leg

bones were fractured and that two metal rods were inserted in his

legs along with four screws and two pins.  He also claimed that
he was in a wheelchair for a year as a result of his injuries.

Subsequent investigation by defense counsel yielded
compelling evidence that Gosselin's testimony regarding his
military service was all a rather ignoble hoax.  An examination
of x-rays taken of Gosselin when he presented at RUMC's emergency
department disclosed no evidence of the wounds he claimed to have
suffered or the appliances he claimed were implanted.  In addi-
tion, a request to the National Personnel Records Center in St.
Louis for Gosselin's service record resulted in the following
response:  "We have reviewed [James Gosselin's] military person-
nel record . . . .  We were able to verify that the individual
served in the United States Army; however, no active duty was
performed other than for training purposes" (Exhibit to the
Letter of Anthony A. Lenza, Jr., Esq. to the Hon. Paul G.
Gardephe, dated May 13, 2016 (D.I. 46)).

Following the foregoing revelations, Gosselin sought to
withdraw his claims with prejudice pursuant to Fed.R.Civ.P.
41(a)(2).  In connection with the proposed withdrawal of
Gosselin's claims, Viera agreed that she would not call Gosselin
as a witness, nor would she rely on any of Gosselin's testimony
either at trial or in connection with any motions.  Although
defendants did not object to the withdrawal of Gosselin's claims

with prejudice and Viera's agreement not to call him or to use
his testimony, several disagreements remained concerning the
conditions that should attach to the dismissal.  Defendants
believed that some of Gosselin's testimony was favorable to them
and sought stipulations as to the facts asserted in that testi-
mony.  Gosselin had also spoken with an expert retained by
plaintiffs, and defendants were also concerned that Gosselin's
testimony might be put before the fact finder through the testi-
mony of the expert.  Defendants also sought to compel Gosselin to
respond to two requests to admit notwithstanding his Fifth
Amendment objection.  Finally, defendants sought to recover their
attorney's fees for the work resulting from Gosselin's claims.

        In an effort to resolve the dispute, I held a confer-
ence with counsel on July 15, 2016 at which I directed defendants
to identify the specific facts to which they sought a stipulation
as a condition to the dismissal of Gosselin's claims.

        One week later, defendants made written submissions
identifying the specific stipulations they sought.  RUMC sought
stipulations as to the following facts:

        1.   Ms. Viera can read and write English (Gosselin
             50-H Hearing Tr. 76:19-21).[1]

------

[1]The citations refer to the source of the proposed
stipulated fact.

2.   In November 2014, Mr. Gosselin's primary means of communication with Ms. Viera was signing 50% of the time and texting 50% of the time (Gosselin Dep. Tr. 30:16-20)

3.   Mr. Gosselin testified that he motions words with his mouth while he signs to Ms. Viera which, she understands approximately 33% of the time (Gosselin Dep. Tr. 30:21-31:15).

4.   Prior to December 1, 2014, Mr. Gosselin did not have any bad experiences at RUMC (Gosselin Dep. Tr. 50:16-18).

5.   Prior to December 1, 2014, Mr. Gosselin is not aware whether Ms. Viera had any bad experiences at RUMC (Gosselin Dep. Tr. 50:20-51:2).

6.   On December 1, 2014 after 9:00PM, Mr. Gosselin felt dizzy and fell while holding his infant son, A.G., in his bedroom (Gosselin Dep. Tr. 33:10-37:10).

7.   At that time, Mr. Gosselin weighed 280 lbs (Gosselin Dep. Tr. 40:8-10).

8.   Mr. Gosselin fell, forcefully landing on A.G.'s legs Gosselin Dep. Tr. 38:18-40:7).

9.   At approximately 10:30PM, Ms. Viera drove Mr. Gosselin and A.G. to RUMC for evaluation and it took about ten minutes to drive to the hospital (Gosselin Dep. Tr. 51:3-12).

10.  Mr. Gosselin did not communicate with Ms. Viera in triage (Gosselin Dep. Tr. 59:8-10).

11.  The triage nurse did not know Ms. Viera was deaf (Gosselin Dep. Tr. 59:16-20).

12.  The emergency physician informed Mr. Gosselin that A.G.'s leg was broken and he needed to be transferred to another hospital for treatment (Gosselin Dep. Tr. 85:19-87:5).

7

13.   Mr. Gosselin relayed this information to Ms. Viera
      on his cell phone by typing it into Notepad
      (Gosselin Dep. Tr. 87:6-88:4).

14.   Mr. Gosselin explained to Ms. Viera that A.G. was
      being transferred to a different hospital, as RUMC
      could not take care of A.G. and that A.G. had a
      broken leg (Gosselin Dep. Tr. 87:6-88:4).

15.   The emergency physician held the x-ray up to the
      light and pointed out the fracture to Mr. Gosselin
      which Ms. Viera observed as well (Gosselin Dep.
      Tr. 85:19-86:5, 93:25-94:18).

16.   Ms. Viera looked at the x-ray and after viewing
      the x-ray, Ms. Viera signed 'Wow' to Mr. Gosselin
      while at RUMC (Gosselin Dep. Tr. 94:2-18).

17.   The x-ray marked Gosselin 2 at Mr. Gosselin's
      deposition clearly shows a broken leg bone
      (Gosselin Dep. Tr. 84:3-18).

18.   The nurse showed Ms. Viera the bottle of Tylenol
      and paperwork that said Tylenol on it before giv-
      ing the medicine to A.G. (Gosselin Dep. Tr.
      93:8-24).

19.   Mr. Gosselin informed Ms. Viera that the emergency
      physician's opinion of the cause of his dizziness
      was dehydration (Gosselin Dep. Tr. 92:13-22).

20.   Ms. Viera has not been back to RUMC since December
      2, 2014 and she will not go back to RUMC (Gosselin
      Dep. Tr. 100:16-20).

(RUMC Submissions (D.I. 72)).

      The City sought stipulations to the following facts:

1.    Ms. Viera can read and write in English (Gosselin
      50-H Tr. 76:19-21).

2.    After Mr. Gosselin informed Ms. Gayle-Curtis that
      Ms. Viera was deaf during an interview on December
      2, 2014 at New York Presbyterian Hospital, Ms.

Gayle-Curtis asked if Ms. Viera can read and write, to which Mr. Gosselin responded that she can (Gosselin 50-H Tr. 46:17-20).

3.   In November of 2014, Mr. Gosselin's communications with Ms. Viera were composed of signing approximately 50% of the time and texting 50% of the time (Gosselin Dep. Tr. 30:16-20).

4.   Mr. Gosselin is the primary point of contact with the schools of his and Ms. Viera's children, other than the schools for Ms. Viera's children who are deaf, and he passes information on to Ms. Viera from the schools (Gosselin Dep. Tr. 117:5-16).

5.   During his interview with Ms. Gayle-Curtis on December 2, 2014, Mr. Gosselin told her, "Well then, by the look on your face, I'd assume that you're an idiot because you don't look smart to me" (Gosselin Dep. Tr. 142:15-17).

6.   During her interview of Mr. Gosselin, Ms. Gayle-Curtis informed him that she needed to visit Mr. Gosselin's and Ms. Viera's home that night (Gosselin Dep. Tr. 146).

7.   Mr. Gosselin texted Ms. Viera before Ms. Gayle-Curtis arrived at the home to inform her that the Administration for Children's Services had interviewed him and was coming to the home (Viera 50-H Tr. 33:3-18).

8.   Approximately one hour later, Mr. Gosselin received a FaceTime call from Ms. Viera and numerous text messages (Gosselin Dep. Tr. 151:4-13, 151:22).

9.   The messages Mr. Gosselin received stated 'ACS is here. What's going on?' (Gosselin Dep. Tr. 152:2-3).

10.  Mr. Gosselin called Ms. Viera on Face Time, and Ms. Viera held the phone so that Mr. Gosselin could see Ms. Gayle-Curtis a foot inside the front door, holding up her identification before pro-

9

gressing into the home (Gosselin Dep. Tr. 154:6-11).

11.  Mr. Gosselin estimated that Ms. Gayle-Curtis spoke to his and Ms. Viera's children on December 2, 2014 for 'just a few minutes' (Gosselin Dep. Tr. 160:9).

(Letter from Lauren A. Lively, Esq. to the undersigned, dated July 21, 2016 (D.I. 71)).

Plaintiff responded to defendants' submissions by letter dated July 28, 2016 (Letter from Andrew Rozynski, Esq. and Leah Wiederhorn, Esq. to the undersigned (D.I. 73)).  Without conceding relevance or materiality, plaintiff agreed to most of the proposed stipulated facts but objected to a few.  Accordingly, I convened a conference on July 29, 2016 to attempt to resolve the disputes concerning the proposed stipulated facts and the disputes concerning the other proposed conditions to the dismissal.

III.  <u>Analysis</u>

A.  Proposed
    <u>Stipulated Facts</u>

In her July 28, 2016 response (D.I. 73), plaintiff Viera agreed to stipulate to all of defendants' proposals (without conceding relevance or materiality) except as discussed below.

10

1.  RUMC's Proposed
    <u>Stipulated Facts</u>

With one exception, and without conceding relevance or materiality, plaintiff does not otherwise object to RUMC's proposed stipulated facts.

At the July 29 conference, plaintiff objected to the phrasing of RUMC's proposed stipulated fact no. 9, and RUMC agreed to change the proposed stipulation to follow Gosselin's testimony more closely.  The parties agreed that RUMC's proposed stipulated fact no. 9 be amended to read, "At early ten maybe 10:30-ish, Ms. Viera drove Mr. Gosselin and A.G. to RUMC for evaluation and it took about ten minutes to drive to the hospital."  With that amendment, plaintiff agreed to all of RUMC's proposed stipulated facts, without conceding relevance or materiality.

2.  The City's Proposed
    <u>Stipulated Facts</u>

Plaintiff had more numerous objections to the City's proposed stipulated facts.  At the outset of the July 29 conference, plaintiff objected to the City's proposed stipulated facts nos. 2, 4, 5, 8 and 11.

11

Plaintiff objected to the City's proposed stipulated fact no. 2 primarily on the ground that it did not accurately reflect all of Gosselin's testimony concerning his response to a question posed by an ACS worker.  I suggested that the proposed stipulated fact be amended to follow Gosselin's actual testimony more closely, but Viera persisted in her objection.  I conclude that the proposed stipulated fact should be taken as true as a condition to the granting of Gosselin's motion to withdraw his claims because it accurately reflects testimony provided by Gosselin.  Accordingly, in addition to the facts to which the parties have stipulated, the dismissal of Gosselin's complaint should be conditioned on the following fact being deemed true:

> After Mr. Gosselin informed Ms. Gayle-Curtis that Ms. Viera was deaf during an interview on December 2, 2014 at New York Presbyterian Hospital, Ms. Gayle-Curtis asked if Ms. Viera can read and write, to which Mr. Gosselin responded yeah, but sign language -- I mean deaf people and hearing people, the words are different.  [Ms. Gayle-Curtis was] like what do you mean.  So [Mr. Gosselin] said they don't use apostrophe, they don't use stuff like that, they don't leave words out.

The foregoing incorporates the potentially relevant portion of Gosselin's 50-H testimony word for word.

Plaintiff Viera withdrew her objections (other than materiality and relevance) to the City's proposed stipulated fact nos. 4 and 5 at the July 29 conference.

The City agreed to rephrase its proposed stipulated fact no. 8 to read, "After Ms. Gayle-Curtis departed, Mr. Gosselin received a FaceTime call from Ms. Viera and numerous text messages."  With that revision, plaintiff Viera withdrew her objections, other than relevance and materiality.

Finally, Viera objected to the City's proposed stipulated fact no. 11.  I proposed amending the proposed stipulated fact as follows to adhere more closely to Gosselin's actual testimony:  "Mr. Gosselin estimated that Ms. Gayle-Curtis tried to speak to his and Ms. Viera's children on December 2, 2014 for just a few minutes" (Gosselin Dep. Tr. 160:9).  Plaintiff persisted in her objection.  I conclude that the City's proposed stipulated fact no. 11, as set forth above, should be taken as true as a condition to the granting of Gosselin's motion to withdraw his claims because it accurately reflects testimony provided by Gosselin.

B.  Plaintiff's
    Expert

Defendants also argued that the withdrawal of Gosselin's claims and his testimony impacted the admissibility of plaintiff's expert's testimony because, in preparing her report, plaintiff's expert had spoken to Gosselin, Gosselin was present

13

when the expert interviewed Viera and the expert had expressed an opinion on Gosselin's ability to communicate using ASL.  The defendants' principal concern was that the expert would indirectly put Gosselin's testimony before the fact finder.  Defendants sought either to preclude the expert from testifying or to re-open her deposition at the expense of either Gosselin or Viera.

Plaintiff retained Dr. Judy A. Shepard-Kegl as an expert to testify to Viera's communication abilities; among other credentials, Dr. Shepard-Kegl holds an M.A. and a Ph.D. in linguistics and a number of certifications from the National Registry of Interpreters for the Deaf.  Dr. Shepard-Kegl's report addresses:  "Ms. Viera's use of interpreters; [h]er primary and preferred mode of communication; and [h]er capacities with respect to the use of American Sign Language and of alternate communication modes such as speech, lipreading, reading, and writing in English" (Undated Report of Dr. Judy A. Shepard-Kegl ("S-K Report", at 2).

Dr. Shepard-Kegl's report opens with a description of the alleged events that give rise to this action, most of which are not in dispute.[2]   The report then goes on to discuss a

---

[2]For example, there is no dispute that the plaintiffs and
(continued...)

number of general principles concerning communication and commu-
nication assessment tools; this discussion does not involve the
facts of this case.  The final section of Dr. Shepard-Kegl's
report is comprised of her assessment of Viera's communication
abilities, including the results of several tests administered by
Dr. Shepard-Kegl.  Dr. Shepard-Kegl did not assess Gosselin's
abilities in ASL, although she did observe his signing while he
was with Viera during the latter's assessment, and her conclusion
addresses Viera's communication skills.  She does, however, make
the following statement concerning Gosselin in her report:

> A look at Ms. Viera's communication skills has
> revealed that critical information could not have been
> shared with her effectively via any form of English --
> speech, writing, reading, lipreading, etc.; or [sic]
> could she share information via English.  While her
> fiancé Could converse with her about shared topics, he
> is not competent to interpret for her.  In watching the
> DWI video, he failed to understand exactly the kind of
> signing she comprehends best.  Her underage children
> were no more competent to do so.  As friends and family
> they are also not considered qualified under the law
> because they are not impartial.

(S-K Report at 78).

---

[2](...continued)
their infant son presented at RUMC's Emergency Department on
December 1, 2014, no dispute that RUMC did not provide an ASL
interpreter, no dispute that ACS personnel subsequently visited
Viera at home and no dispute that, with one exception, the ACS
employee who performed the home visits was not accompanied by an
ASL interpreter.

After hearing extensive argument on July 29, I con-
cluded that defendants' applications either to preclude Dr.
Shepard-Kegl or to reopen her deposition, as conditions to the
dismissal of Gosselin's claims, should be denied because defen-
dants failed to demonstrate how the revelations concerning
Gosselin's deposition testimony called Dr. Shepard-Kegl's conclu-
sions into question or justified further inquiry.  Defendants
argued that in Gosselin's interactions with Dr. Shepard-Kegl, he
may have exaggerated certain facts or understated his own abili-
ties to communicate in ASL.  Although this possibility exists, it
existed even before the discovery that Gosselin appeared to have
exaggerated his military service.  At the time he met with Dr.
Shepard-Kegl, Gosselin was a party with an interest in the
outcome of the case and had the interest, that all parties have,
to shade the facts in his favor.  Gosselin's interest in under-
stating his own abilities in ASL in order to enhance the likeli-
hood of prevailing on the merits has never changed, and defen-
dants had the same incentive and ability to cross-examine Dr.
Shepard-Kegl concerning Gosselin's possible exaggeration of
facts, or understatement of his ASL skills, even before the
discovery of Gosselin's apparent perjury.  The discovery that
Gosselin might have fabricated his military exploits does not
alter the bases on which defendants could have cross-examined Dr.

16

Shepard-Kegl.  Stated differently, because Gosselin's purported
military exploits played no role in the formation of Dr. Shepard-
Kegl's opinion, the revelation that Gosselin's claimed heroics
are probably fabrications does not warrant the preclusion of Dr.
Shepard-Kegl or the re-opening of her deposition.

However, there are two statements in Dr. Shepard-Kegl's
report that appear to have originated with Gosselin.  At pages 4
and 5 of her report, Dr. Shepard-Gosselin states:

> [B]oth the hospital and ACS often attempted to force
> James Gosselin or Ms. Viera's children to interpret
> instead of properly accommodating Ms. Viera's disabil-
> ity.  In the case of using Mr. Gosselin as an inter-
> preter, we also see the wholly inappropriate use of a
> family member who, until the ACS investigation deter-
> mined no evidence of abuse of neglect [sic], was also
> under investigation for abuse and neglect.
>
> *     *     *
>
> Near weekly surprise visits were held, but none where
> Ms. Viera had any communication access except via her
> husband or, in the absence of her husband, one of her
> young children.  None of these individuals were compe-
> tent to interpret.

To the extent the foregoing statements reflect historical facts,
Dr. Shepard-Kegl should be precluded from testifying to them
because she has no first-hand knowledge of those facts.

17

C.   <u>Requests to Admit</u>

Defendants also seek to condition the dismissal of Gosselin's claim on his responding to the following requests to admit:

> 1.   The genuineness of the attached FOIA response from the National Personnel Records Center dated April 29, 2016 documenting that James Gosselin never performed active duty for the United States Army other than for training purposes.

> 2.   The fact that James Gosselin never performed active duty for the United States army other than for training purposes.

Gosselin has refused to respond to a request for these admissions, citing his Fifth Amendment privilege against self- incrimination.   Defendants claim that the fact that Gosselin testified about his military history operates as a waiver of his Fifth Amendment privilege.

Defendants application to require responses to these requests to admit as a condition of the dismissal of Gosselin's claims should be denied.   As a threshold matter, the requests have no relevance if Gosselin's claims are dismissed.   Once Gosselin is out of the case, and given plaintiff's agreement not to rely on his testimony, the fact that he probably lied about his military record has no relevance to the alleged facts that give rise to Viera's claim nor does that fact relate to Viera's

credibility.  In short, once Gosselin is out of the case, the fact that he probably lied about his military record has nothing to do with the remaining issues.

Moreover, Gosselin has not waived his Fifth Amendment privilege.  Defendants' contention that his deposition testimony itself is a waiver is based on flawed logic.  Defendants' argument is based on the proposition that "[a] witness who fails to invoke the Fifth Amendment against questions as to which he could have claimed it is deemed to have waived his privilege respecting all questions on the same subject matter."  United States v. O'Henry's Film Works, Inc., 598 F.2d 313, 317 (2d Cir. 1979). Defendants argue that by testifying about his military history, waived his Fifth Amendment privilege with respect to the two requests to admit set forth above.

There is no reasons to believe and no claim that Gosselin committed any crime before his deposition.  Assuming that Gosselin did lie at his deposition regarding his military record, his perjury did not occur until he made the false statements themselves.  Because Gosselin's testimony concerning his military record (assuming its falsity) was itself the crime of perjury, that testimony itself could not be a waiver of the Fifth Amendment privilege.  As a matter of logic, the privilege against self-incrimination cannot be waived through a party's failure to

19

assert the privilege until the potential for criminal liability
exists.  If it was false, Gosselin's testimony, under oath,
concerning his military record was itself a crime.  If Gosselin
subsequently and voluntarily admitted that his testimony was
false, he would have waived his Fifth Amendment privilege, but
there is no claim that he did so.  There are no statements by
Gosselin subsequent to his deposition testimony admitting the
falsity of that testimony and, therefore, no waiver.

Because there is no evidence of any conduct by Gosselin
subsequent to his deposition that could constitute a waiver,
Gosselin's Fifth Amendment objection to the requests to admit is
well founded.

D.  Attorney's Fees

Defendants also seek to condition the dismissal of
Gosselin's claims on Gosselin reimbursing them for at least some
of their attorney's fees.

To the extent defendants seek fees under Rule 41(a)(2),
their claims are barred by Colombrito v. Kelly, 764 F.2d 122 (2d
Cir. 1985).  In that case, like this one, the plaintiff had
withdrawn his claims with prejudice pursuant to Rule 41(a)(2),
and defendants sought a fee award as a condition of the dis-

20

missal.  In reversing an award of fees by the District Court, the
Court of Appeals explained:

> The reason for denying a fee award upon dismissal
> of claims with prejudice is simply that the defendant,
> unlike a defendant against whom a claim has been dis-
> missed without prejudice, has been freed of the risk of
> relitigation of the issues just as if the case had been
> adjudicated in his favor after a trial, in which event
> (absent statutory authorization) the American Rule
> would preclude such an award.  Here, there is no ques-
> tion that the dismissal is with prejudice as to [plain-
> tiffs], leaving [defendants] wholly free of the risk of
> [plaintiff]-supported suits stemming from adjudication
> of the merits.  We would not want to discourage such a
> salutory disposition of litigation by threatening to
> award attorneys' fees if a plaintiff did not complete a
> trial.  See [Larchmont Eng'g, Inc. v. Toggenburg Ski
> Ctr., Inc., 444 F.2d 490, 491 (2d Cir. 1971)]; Arthur
> v. Starrett City Associates, supra, 98 F.R.D. at 505.
>
> *     *     *
>
> Our reading of Rule 41(a)(2) does not altogether
> foreclose fees in the event of a dismissal with preju-
> dice.  Conceivably such an award might be one of the
> appropriate "terms or conditions" authorized by Rule
> 41(a)(2), e.g., if a litigant had made a practice of
> repeatedly bringing potentially meritorious claims and
> then dismissing them with prejudice after inflicting
> substantial litigation costs on the opposing party and
> the judicial system.  In any event, this is not such a
> case.

Colombrito v. Kelly, supra, 764 F.2d at 134-35 (footnote omit-

ted).

There is no evidence that Gosselin has engaged in the

type of practice identified by the Court of Appeals as poten-

tially warranting an award of fees as a condition to dismissal
under Rule 41(a)(2).

As an alternative, defendants rely on the Court's
inherent powers to support an award of fees.  This argument also
fails under Colombrito.  As explained in that case, an award of
fees to a prevailing party runs contrary to the American Rule.  A
litigant may, however, seek an award of fees under the Court's
inherent power when a party commences an action frivolously and
in bad faith.  "The bad faith exception permits an award [of
fees] upon a showing that the claim is entirely without color and
has been asserted wantonly, for purposes of harassment or delay,
or for other improper reasons.  Neither meritlessness alone nor
improper motives alone will suffice."  Colombrito v. Kelly,
supra, 764 F.2d at 133 (internal quotation marks and citations
omitted).

Although defendants claim that Gosselin's apparent
perjury at his deposition renders his claims frivolous, defen-
dants' argument is without merit because Gosselin's apparent
perjury bears no relationship to the merits of the action.  In an
apparent effort to burnish his credibility, Gosselin appears to
have lied about his military service -- a matter that has nothing
to do with the merits of this action.  Moreover, there is no
dispute that the events that are central to this action --

22

defendants' failure to provide an ASL interpreter for Viera during the visit to RUMC and during ACS home visits -- did, in fact, occur.  Finally, Gosselin's decision to withdraw his claims with prejudice does not give rise to an inference that his claims were frivolous; rather, it was an attempt to prevent Viera from being adversely affected by Gosselin's perjury.  Once Gosselin's apparent perjury was disclosed, his credibility was profoundly damaged and there was a risk of spill-over prejudice to Viera. If anything, Gosselin's decision to withdraw his claims is an acknowledgment only of the irremediable damage he did to his own credibility.  There is, therefore, no basis for an award of fees under the frivolous-and-bad-faith exception to the American Rule.

IV.  Conclusion

        Accordingly, for all the foregoing reasons, I respect-fully recommend that plaintiff Gosselin's motion to withdraw his claims with prejudice pursuant to Fed.Civ.P. 41(a)(2) (D.I. 64) be granted on the condition that (1) plaintiff Viera will not offer any deposition testimony, affidavit or other evidence from Gosselin in support of her claims; (2) the statements set forth in Appendix A to this Report and Recommendation be deemed true in all subsequent proceedings in this matter, without prejudice to plaintiff's right to object to the relevance or materiality of

any statement and (3) Viera's expert be precluded from testifying
to the statements set forth in Appendix B to this Report and
Recommendation.  I further recommend that defendants' request for
other conditions be denied.

V.   <u>OBJECTIONS</u>

          Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of
the Federal Rules of Civil Procedure, the parties shall have
fourteen (14) days from receipt of this Report to file written
objections.  <u>See also</u> Fed.R.Civ.P. 6(a).  Such objections (and
responses thereto) shall be filed with the Clerk of the Court,
with courtesy copies delivered to the Chambers of the Honorable
Paul G. Gardephe, United States District Judge, 40 Centre Street,
Room 2204, and to the Chambers of the undersigned, 500 Pearl
Street, Room 1670, New York, New York 10007.  Any requests for an
extension of time for filing objections must be directed to Judge
Gardpehe.  FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS **WILL**
RESULT IN A WAIVER OF OBJECTIONS AND **WILL** PRECLUDE APPELLATE
REVIEW.  <u>Thomas v. Arn</u>, 474 U.S. 140, 155 (1985); <u>United States
v. Male Juvenile</u>, 121 F.3d 34, 38 (2d Cir. 1997); <u>IUE AFL-CIO
Pension Fund v. Herrmann</u>, 9 F.3d 1049, 1054 (2d Cir. 1993); <u>Frank
v. Johnson</u>, 968 F.2d 298, 300 (2d Cir. 1992); <u>Wesolek v. Canadair</u>

24

Ltd., 838 F.2d 55, 57-59 (2d Cir. 1988); McCarthy v. Manson, 714

F.2d 234, 237-38 (2d Cir. 1983) (per curiam).

Dated:  New York, New York
        January 13, 2017

                                    Respectfully submitted,


                                    _____
                                    HENRY PITMAN
                                    United States Magistrate Judge

Copies transmitted to:

All Counsel

APPENDIX A

1.  Ms. Viera can read and write English.

2.  In November 2014, Mr. Gosselin's primary means of communication with Ms. Viera was signing 50% of the time and texting 50% of the time.

3.  Mr. Gosselin testified that he motions words with his mouth while he signs to Ms. Viera, which she understands approximately 33% of the time.

4.  Prior to December 1, 2014, Mr. Gosselin did not have any bad experiences at RUMC.

5.  Prior to December 1, 2014, Mr. Gosselin is not aware whether Ms. Viera had any bad experiences at RUMC.

6.  On December 1, 2014 after 9:00PM, Mr. Gosselin felt dizzy and fell while holding his infant son, A.G., in his bedroom.

7.  At that time, Mr. Gosselin weighed 280 lbs..

8.  Mr. Gosselin fell, forcefully landing on A.G.'s legs.

9.  At early ten maybe 10:30-ish, Ms. Viera drove Mr. Gosselin and A.G. to RUMC for evaluation and it took about ten minutes to drive to the hospital.

10.  Mr. Gosselin did not communicate with Ms. Viera in triage.

11.  The triage nurse did not know Ms. Viera was deaf.

12.  The emergency physician informed Mr. Gosselin that A.G.'s leg was broken and he needed to be transferred to another hospital for treatment.

13.  Mr. Gosselin relayed this information to Ms. Viera on his cell phone by typing it into Notepad.

14.  Mr. Gosselin explained to Ms. Viera that A.G. was being transferred to a different hospital as RUMC could not take care of A.G. and that A.G. had a broken leg.

26

15.   The emergency physician held the x-ray up to the light and pointed out the fracture to Mr. Gosselin which Ms. Viera observed as well.

16.   Ms. Viera looked at the x-ray and after viewing the x-ray, Ms. Viera signed 'Wow' to Mr. Gosselin while at RUMC.

17.   The x-ray marked Gosselin 2 at Mr. Gosselin's deposition clearly shows a broken leg bone.

18.   The nurse showed Ms. Viera the bottle of Tylenol and paperwork that said Tylenol on it before giving the medicine to A.G.

19.   Mr. Gosselin informed Ms. Viera that the emergency physician's opinion of the cause of his dizziness was dehydration.

20.   Ms. Viera has not been back to RUMC since December 2, 2014 and she will not go back to RUMC.

21.   After Mr. Gosselin informed Ms. Gayle-Curtis that Ms. Viera was deaf during an interview on December 2, 2014 at New York Presbyterian Hospital, Ms. Gayle-Curtis asked if Ms. Viera can read and write, to which Mr. Gosselin responded yeah, but sign language -- I mean deaf people and hearing people, the words are different.   [Ms. Gayle-Curtis was] like what do you mean.   So [Mr. Gosselin] said they don't use apostrophe, they don't use stuff like that, they don't leave words out.

22.   In November of 2014, Mr. Gosselin's communications with Ms. Viera were composed of signing approximately 50% of the time and texting 50% of the time.

23.   Mr. Gosselin is the primary point of contact with the schools of his and Ms. Viera's children, other than the schools for Ms. Viera's children who are deaf, and he passes information on to Ms. Viera from the schools.

24.   During his interview with Ms. Gayle-Curtis on December 2, 2014, Mr. Gosselin told her, "Well then, by the look on your face, I'd assume that you're an idiot because you don't look smart to me."

27

25. During her interview of Mr. Gosselin, Ms. Gayle-Curtis informed him that she needed to visit Mr. Gosselin's and Ms. Viera's home that night.

26. Mr. Gosselin texted Ms. Viera before Ms. Gayle-Curtis arrived at the home to inform her that the Administration for Children's Services had interviewed him and was coming to the home.

27. After Ms. Gayle-Curtis departed, Mr. Gosselin received a FaceTime call from Ms. Viera and numerous text messages.

28. The messages Mr. Gosselin received stated 'ACS is here. What's going on?'

29. Mr. Gosselin called Ms. Viera on Face Time, and Ms. Viera held the phone so that Mr. Gosselin could see Ms. Gayle--Curtis a foot inside the front door, holding up her identification before progressing into the home.

30. Mr. Gosselin estimated that Ms. Gayle-Curtis tried to speak to his and Ms. Viera's children on December 2, 2014 for just a few minutes.

## APPENDIX B

1.    [B]oth the hospital and ACS often attempted to force
James Gosselin or Ms. Viera's children to interpret instead of
properly accommodating Ms. Viera's disability.   In the case of
using Mr. Gosselin as an interpreter, we also see the wholly
inappropriate use of a family member who, until the ACS investi-
gation determined no evidence of abuse of neglect [sic], was also
under investigation for abuse and neglect.

2.    Near weekly surprise visits were held, but none where
Ms. Viera had any communication access except via her husband or,
in the absence of her husband, one of her young children.   None
of these individuals were competent to interpret.