UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _9/30/18_

JOSIY VIERA,

                              Plaintiff,

               -against-

THE CITY OF NEW YORK and
RICHMOND UNIVERSITY MEDICAL
CENTER,

                              Defendants.

**MEMORANDUM
ORDER & OPINION**

15 Civ. 5430 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

          Josiy Viera – who is deaf – and James Gosselin,[1] her fiancé, brought this action

against Richmond University Medical Center ("RUMC") and the City of New York (the "City"),

---

[1] Gosselin's claims were dismissed after he falsely testified at his deposition that he served in
the United States Army for ten years; that he had been assigned to Echo Company of the 75th
U.S. Army Rangers Special Forces unit headquartered in Fort Benning, Georgia; that he had
served three tours of duty in Iraq, two tours of duty in Afghanistan, and one tour of duty in
Egypt; that he served as a combat medic and backup scout sniper; that he received a Silver Star
for "bravery and heroism" in Fallujah, Iraq, in connection with saving another soldier's life; that
he received the Purple Heart for wounds he sustained while on active duty; that he was shot 14
times in both legs while on active duty; and that he received other wounds in combat. (See R &
R (Dkt. No. 106) at 3-5; Gosselin Dep. at 11-14, 20-23) After Defendant RUMC proffered
personnel records showing that Gosselin had never been on active duty – other than for training –
(see May 13, 2016 RUMC Ltr. (Dkt. No. 50) at 7), Plaintiffs sought to voluntarily dismiss
Gosselin's claims with prejudice. (Notice of Motion (Dkt. No. 63)) "In connection with
Gosselin's motion, Viera agreed that she would not call Gosselin as a witness or rely on
Gosselin's testimony, either at trial or in connection with any motion." (Order (Dkt. No. 116) at
4 (citing R & R (Dkt. No. 106) at 5; June 14, 2016 Pltf. Ltr. (Dkt. No. 59) at 1))

This Court granted Plaintiffs' motion to voluntarily dismiss Gosselin's claims on the condition
that "(1) Plaintiff Viera will not offer any deposition testimony, affidavit, or other evidence from
Plaintiff Gosselin to support her claims, whether in motion practice or at trial; (2) the stipulations
of fact set forth in Appendix A of Judge Pitman's R & R will be deemed true in all subsequent
proceedings in this matter, without prejudice to Plaintiff Viera's right to object to the relevance or
materiality of any stipulated fact; and (3) the statements set forth in Appendix B of Judge
Pitman's R & R are not to be cited in motion practice or introduced or relied on at trial . . . to the

alleging that Defendants' failure to provide an American Sign Language ("ASL") interpreter to Viera in connection with (1) her December 1, 2014 visit to RUMC, and (2) New York City Administration for Children's Services ("ACS") home visits, violates the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq.; Section 504 of the Rehabilitation Act of 1973 ("RA"), 29 U.S.C. § 794; the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law §§ 290 et seq.; and the New York City Human Rights Law ("NYCHRL"), N.Y. Admin. Code §§ 8-101 et seq. (Cmplt. (Dkt. No. 1) ¶¶ 6, 58-114)[2] Viera seeks compensatory damages.[3] (Id. ¶ 6)

On July 21, 2017, this Court granted Defendant RUMC's motion for summary judgment. Cross-motions filed by Plaintiff and the City as to Plaintiff's deliberate indifference claim against the City were denied. (Mem. Op. & Order (Dkt. No. 118) at 47)[4] As to RUMC, the Court found that Viera and Gosselin had never requested an ASL interpreter, and that there was no indication given by Viera or Gosselin to RUMC personnel that effective communication was not taking place. (Id. at 33-35) In light of this undisputed evidence, the Court concluded that a reasonable jury could not find that RUMC acted with "deliberate indifference to the strong likelihood that [Viera's] federally protected rights [would be violated by the failure to provide an ASL interpreter.]" (See id. at 30-37)

---

extent that Plaintiff Gosselin is the sole source for the information contained in those statements." (Id. at 14)

[2] Unless otherwise indicated, the page numbers of documents referenced in this Order correspond to the page numbers designated by this District's Electronic Case Filing system.

[3] Although the Complaint contains a request for injunctive relief, Viera no longer seeks such relief. (See Pltf. Br. in Opp. to Sum. J. (Dkt. No. 84) at 9)

[4] Familiarity with the Court's July 21, 2017 Memorandum Opinion & Order (Dkt. No. 118) is presumed.

Plaintiff has moved for reconsideration of this Court's order granting RUMC summary judgment "on the basis that the Court misapprehended the law and overlooked material evidence of specific instances of communication, which resulted in clear error and manifest injustice." (Mot. (Dkt. No. 120); Pltf. Recons. Br. (Dkt. No. 128) at 5)

For the reasons stated below, Plaintiff's motion for reconsideration will be denied as to Plaintiff's Rehabilitation Act and NYSHRL claims, but granted as to Plaintiff's NYCHRL claim. The NYCHRL claim will be dismissed without prejudice to refiling in a New York state court.

## BACKGROUND

### I.    FACTS

#### A.    RUMC's Policy and Practice Concerning the Provision of Sign Language Interpreters

RUMC does not maintain ASL interpreters on staff. Instead, it contracts with ASL interpreters to provide services on demand. (Pltf. R. 56.1 Counterstmt. (Dkt. No. 88) ¶ 222; Lenza Decl., Ex. 3 (Kaufman Decl.) (Dkt. No. 82-3) ¶ 20)[5] RUMC's "policy and practice" is to "provide an onsite interpreter when a deaf or hard of hearing patient or companion requests an onsite interpreter," and to "provide an interpreter to a deaf or hard of hearing patient or

---

[5]   To the extent that this Court relies on facts drawn from a party's Local Rule 56.1 statement, it has done so because the opposing party has either not disputed those facts or has not done so with citations to admissible evidence. See Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.") (citations omitted). Where Plaintiff has disputed RUMC's characterization of cited evidence, and has presented an evidentiary basis for doing so, the Court relies on Plaintiff's characterization of the evidence. See Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001) (court must draw all rational factual inferences in non-movant's favor in deciding summary judgment motion). Unless otherwise indicated, the facts cited by the Court are undisputed.

companion regardless of whether an interpreter is requested" if an interpreter is believed to be necessary to communicate. (Lenza Decl., Ex. 4 (Navarro Decl.) (Dkt. No. 82-4) ¶¶ 6-7)

RUMC's "Language Assistance Services" policy requires RUMC to take steps "to ensure that patients and visitors with limited English proficiency (L.E.P.) and related needs have the opportunity to effectively communicate with hospital staff." (Lenza Decl., Ex. 5 (RUMC Policy) (Dkt. No. 82-5) at 2) RUMC's policy provides that

> [u]pon admission or registration, hospital staff will identify a patient's primary language and offer language assistance services to any L.E.P. patient who needs it. Staff who has difficulty identifying a patient's primary language shall use a Language Identification Card, available at the patient information desk, registration, clinics and nursing units, to ascertain the language and arrange for the appropriate assistance. A patient is considered to be in need of language assistance services if staff cannot effectively communicate with the patient and/or if the patient requests such services. All such patients shall be told, using an interpreter if necessary, that they are entitled to language assistance services, free of charge. Staff shall defer to a patient's own assessment of his/her need for language assistance services. The Registrar shall note the patient's primary language and need for language assistance on the admitting face sheet, which is kept in the medical record. The admitting nurse shall also ask the patient's primary language spoken and assess the need for an interpreter and enter the information on the Interdisciplinary Care Plan (ICP). The nurse or clerk will enter the language information in the Clinical Meditech System on the nursing unit.

(Id.)

RUMC's policy further provides that

> [i]f a patient refuses the hospital's language assistance services, hospital staff shall assess the appropriateness of that choice and reinforce to the patient, using an interpreter, that such services are free of charge. If the patient continues to refuse services, the staff member shall complete the form entitled, "Refusal of Language Assistance Services" and place it in the medical record. Staff may defer to a patient who wishes to use a family member or friend as an interpreter, but persons under 18 may not be used as interpreters except in emergencies, to avoid harm to the patient.

(Id. at 3)

RUMC's Language Service Coordinator states that it is RUMC's policy and practice to post signs indicating that sign language interpreters are available throughout the

hospital, including in the Emergency Department. (Lenza Decl., Ex. 4 (Navarro Decl.) (Dkt. No. 82-4) ¶¶ 1, 9) Dr. Mansoor Khan – an emergency room physician at RUMC – testified that although he is not sure if he had ever observed signs notifying deaf patients "of their right to a sign language interpreter," he had observed signs in RUMC's Emergency Department generally "notifying patients of their rights to receive interpreter services." (Wiederhorn Decl., Ex. T (Khan Dep.) (Dkt. No. 87-1) at 9:12-15, 33:25-34:17) Marilyn Mora, an RUMC nurse, similarly testified that she could not recall whether there were any signs – in the Emergency Department – notifying "a deaf patient of his or her right to receive an interpreter." (Wiederhorn Decl., Ex. V (Mora Dep.) (Dkt. No. 87-3) at 57:4-9) Esther Rose, another RUMC nurse, testified that the Registrar provides all patients with a "patient's rights document" upon their admission, which states "Language Line solutions Interpretations Services Available." (Wiederhorn Decl., Ex. U (Rose Dep.) (Dkt. No. 87-2) at 150:20-151:16) Rose further testified that this document is posted on the notice board in the Emergency Department's triage room. (Id. at 151:13-152:2)

RUMC provides ADA compliance training to its staff during orientation, and through ongoing trainings. (Lenza Decl., Ex. 4 (Navarro Decl.) (Dkt. No. 82-4) ¶ 18) RUMC employees receive training concerning available language services, such as ASL interpreters for deaf or hard of hearing patients or companions. (Id.) Nurse Mora testified that she received training regarding RUMC's Language Assistance Services policy, on how to treat deaf patients, and on RUMC's ASL interpreter services, and that – based on her training – she is aware that RUMC maintains a resource of certified sign language interpreters for deaf patients. (Wiederhorn Decl., Ex. V (Mora Dep.) (Dkt. No. 87-3) at 49:21-50:16, 52:25-53:11, 57:25-58:7, 58:21-59:8) Nurse Rose also testified that she received training on RUMC's Language Assistance Services policy as a part of her orientation. (Wiederhorn Decl., Ex. U (Rose Dep.)

(Dkt. No. 87-2) at 55:25-57:14, 58:11-25, 82:13-20, 85:16-86:14)  Although she did not receive any additional formal training beyond her orientation training, Rose testified that RUMC's policies were frequently discussed and reinforced at staff meetings, and that RUMC's policy is to make hearing-impaired patients aware that the hospital offers an interpreter service.  (See id. at 55:25-57:14, 58:11-25, 70:9-18, 82:13-84:16)  Dr. Khan and Dr. Matthew Kaufman – an RUMC emergency room physician and Associate Director of the RUMC Emergency Department – testified that they do not recall having received any such formal training at RUMC. [6] (Wiederhorn Decl., Ex. T (Khan Dep.) (Dkt. No. 87-1) at 26:14-28:2; Wiederhorn Decl., Ex. X (Kaufman Dep.) (Dkt. No. 87-5) at 21:7-11)

According to Dr. Kaufman, "sign language interpreters are frequently utilized in RUMC's Emergency Department and are readily available after they are contacted."  (Lenza Decl., Ex. 3 (Kaufman Decl.) (Dkt. No. 82-3) ¶ 6)  Indeed, Dr. Kaufman "use[s] [sign language interpreters] all the time" at RUMC.  (Wiederhorn Decl., Ex. X (Kaufman Dep.) (Dkt. No. 87-5) at 31:24-32:8)  Nurse Rose has also "personally requested and utilized a sign language interpreter for deaf patients at RUMC's Emergency Department," and she is "aware of RUMC's policy regarding providing interpreters for non-English speaking patients[,] . . . which includes deaf or hard of hearing patients."  (Lenza Decl., Ex. 18 (Rose Decl.) (Dkt. No. 82-17) ¶¶ 13-14)

---

[6] Dr. Khan testified, however, that learning how to effectively communicate with patients was a part of his training and practice as an Emergency Room physician. (See Wiederhorn Decl., Ex. T (Khan Dep.) (Dkt. No. 87-1) at 26:14-28:2)  Dr. Kaufman testified that although he could not recall whether he had ever read RUMC's policy concerning language assistance services, he was familiar with that policy in practice. (Wiederhorn Decl., Ex. X (Kaufman Dep.) (Dkt. No. 87-5) at 21:7-23:7)

Over the two month period between November 1, 2014 and December 31, 2014, RUMC provided ASL interpreters more than forty times, including on six occasions in the Emergency Department. (Pltf. R. 56.1 Counterstmt. (Dkt. No. 88) ¶ 236)

## B. Viera's Prior Contact with RUMC

Prior to Viera's December 1, 2014 visit to RUMC, RUMC had provided Viera with an ASL interpreter on at least one occasion. (Pltf. R. 56.1 Counterstmt. (Dkt. No. 88) ¶ 251; Lenza Decl., Ex. 8 (Viera Dep.) (Dkt. No. 82-8) at 33:15-18 (testifying that during one of her prior visits to RUMC as a patient, she was provided with an ASL interpreter))

On August 27, 2014 – about three months before the December 1, 2014 incident at issue here – Viera was admitted to RUMC for the labor and delivery of A.G. (See Pltf. R. 56.1 Stmt. (Dkt. No. 88) ¶¶ 245-47; Lenza Decl., Ex. 8 (Viera Dep.) (Dkt. No. 82-8) at 34:9-20) Viera signed a Refusal of Language Assistance Services form at that time, which reads as follows:

> I . . . acknowledge that Richmond University Medical Center; through an Interpreter, has offered me free Language Assistance Services. I am choosing to use my own Interpreter and am refusing the hospital's language services. I understand that if I change my mind and decide to use the hospital's services, an Interpreter will be provided.

(See Lenza Decl., Ex. 12 (Refusal of Language Services Form) (Dkt. No. 82-11) at 3) Viera indicated on the form that James Gosselin was her interpreter and that he was her husband. (Id.; Pltf. R. 56.1 Counterstmt. (Dkt. No. 88) ¶ 247) The progress note accompanying the form states: "Pt offered interpreter and declines. Consents to husband to be her interpreter. Pt can read lips[.]" (Lenza Decl., Ex. 12 (Refusal of Language Services Form) (Dkt. No. 82-11) at 4; Pltf. R. 56.1 Counterstmt. (Dkt. No. 88) ¶ 246)

7

There is no evidence that – during any visit to RUMC – Viera ever requested an ASL interpreter but was not provided with one.  (See Lenza Decl., Ex. 8 (Viera Dep.) (Dkt. No. 82-8) at 33:22-34:2)

### C.    Viera's Communication Abilities

Viera can read and write English.  (R & R (Dkt. No. 106), Appendix A at 26 ¶ 1)[8] Indeed, at her deposition, Viera testified that she is able to read and write English, and that she communicates with her fiancé, James Gosselin, through text messages:

Q.    When you met Mr. Gosselin, how did you communicate with him?

A.    We texted each other.

Q.    Are you able to read and write in English?
. . . .
A.    Yes, I can.

Q.    When you text Mr. Gosselin, is that in English?

A.    Yes.

(Lenza Decl., Ex. 8 (Dkt. No. 82-8) at 17:20-18:7)  Moreover, Viera testified that when she met Gosselin, she communicated with him primarily by typing written messages to him on her phone, because – at the time – he knew very little sign language.  (Id.)  After Gosselin moved in with Viera, she communicated with him primarily through text messages and body language.  (Id. at 18:22-19:3)

---

[8]  In her briefing at summary judgment and in support of her motion for reconsideration, Plaintiff denies that she can read and write English.  (See Pltf. R. 56.1 Counterstmt. (Dkt. No. 88) ¶ 237; Pltf. Recons. Br. (Dkt. No. 128) at 26-27)  This assertion is flatly contradicted by Plaintiff's deposition testimony.  (See Lenza Decl., Ex. 8 (Dkt. No. 82-8) at 17:20-18:7)  Moreover, as noted above, this Court expressly conditioned dismissal of Gosselin's claims on "the stipulations of fact set forth in Appendix A of Judge Pitman's R & R . . . be[ing] deemed true in all subsequent proceedings in this matter[.]"  (Order (Dkt. No. 116) at 14)  Paragraph 1 of Appendix A states, "Ms. Viera can read and write English."  (R & R (Dkt. No. 106), Appendix A at 26 ¶ 1)

Viera has been teaching Gosselin how to sign, but he is not fluent in ASL. (See Lenza Decl., Ex. 9 (Viera 50-H Hearing) (Dkt. No. 82-9) at 10:6-12) As of November 2014, Gosselin's communications with Viera were evenly split between signing and texting. (Pltf. R. 56.1 Resp. (Dkt. No. 99) ¶ 493; R & R (Dkt. No. 106), Appendix A at 26 ¶ 22)

Dr. Judy Shepard Kegl – a certified ASL interpreter – assessed Viera's communication needs and abilities in connection with this litigation. (Pltf. R. 56.1 Counterstmt. (Dkt. No. 88) ¶ 332) Kegl testified that Viera needs a sign language interpreter in order to communicate. (Id. ¶ 335) Kegl observed Viera's sign language communication with Gosselin, and noted that Viera simplified and slowed down her signing when communicating with Gosselin. (RUMC R. 56.1 Resp. (Dkt. No. 91) ¶ 334)

As to reading lips, Viera testified that she does not know whether she is able to read lips. (Wiederhorn Decl., Ex. DD (Viera Dep.) (Dkt. No. 87-12) at 28:19-29:1) Viera explained that she is sometimes able to understand Gosselin's speech by way of lip reading, but that it depends on how quickly he is speaking. (Id. at 28:19-30:14) Dr. Kegl concluded that Viera's lip reading ability is below average. (See Wiederhorn Decl., Ex. BB (Kegl Report) (Dkt. No. 87-10) at 65) According to Dr. Kegl, Viera is only able to identify 8% of sentences and phrases by reading lips, although she is better at understanding individual words as opposed to whole phrases. (Id.)

**D.**    **Viera and Gosselin's December 1, 2014 Visit to RUMC**

In December 2014, Viera and Gosselin were living together with their seven children in Staten Island, New York. (Pltf. R. 56.1 Resp. (Dkt. No. 99) ¶ 383; see Wiederhorn Decl., Ex. B (Viera Dep.) (Dkt. No. 78-2) at 49:1-5) On December 1, 2014, Gosselin fell while

holding the couple's four-month-old son, A.G., and landed forcefully on A.G.'s legs.[8] (Pltf. R. 56.1 Counterstmt. (Dkt. No. 88) ¶ 253; Lenza Decl., Ex. 14 (Gosselin Dep.) (Dkt. No. 82-13) at 38:20-25; Lenza Decl., Ex. S14 (Gosselin Dep.) (Dkt. No. 86-2) at 40:1-10; R & R (Dkt. No. 106), Appendix A at 26 ¶ 8) Viera was not at home when the accident happened. (Pltf. R. 56.1 Counterstmt. (Dkt. No. 88) ¶ 256) After Viera returned home, the couple decided to take A.G. to RUMC for treatment, because "A.G.'s leg appeared limp and made a crackling noise." (Id. ¶ 257). Viera drove A.G. and Gosselin to the hospital between 10:00 and 10:30 p.m. (Id. ¶ 258; Cmplt. (Dkt. No. 1) ¶ 11)

At 10:52 p.m., Nurse Mora finished her triage assessment of Gosselin, and at 10:59 p.m., she completed her triage assessment of A.G.. (Pltf. R. 56.1 Counterstmt. (Dkt. No. 88) ¶¶ 265, 271) Mora's notes indicate that, "as per dad, he fell on baby, brother took dad off baby, baby cried instantly, baby continues to cry." (Id. ¶ 261; see Lenza Decl., Ex. 16 (RUMC Physician Notes) (Dkt. No. 82-15) at 10; Wiederhorn Decl., Ex. V (Mora Dep.) (Dkt. No. 87-3) at 43:4-21) Nurse Mora scored A.G.'s pain level as an 8 out of 10, and assigned him a priority level of 2. (Pltf. R. 56.1 Counterstmt. (Dkt. No. 88) ¶¶ 266-67) "A Level 2 trauma is a medical emergency involving a high probability of imminent or life threatening deterioration in a patient's medical condition." (Lenza Decl., Ex. 3 (Kaufman Decl.) (Dkt. No. 82-3) ¶ 15)

Viera was not with Gosselin and A.G. when they first presented in triage. (Lenza Decl., Ex. 17 (Mora Decl.) (Dkt. No. 82-16) ¶ 9) Viera entered the triage area at some point during Nurse Mora's assessment. (Id.) Because Mora had already learned what happened from Gosselin, Mora did not communicate with Viera while she was in the triage area, and was

_____

[8] At the time of the incident, Gosselin weighed approximately 280 pounds. (Lenza Decl., Ex. S14 (Gosselin Dep.) (Dkt. No. 86-2) at 40:1-10; R & R (Dkt. No. 106), Appendix A at 26 ¶ 7)

unaware that Viera was deaf while Viera was in the triage room. (Id. ¶¶ 10, 12; Pltf. R. 56.1

Counterstmt. (Dkt. No. 88) ¶¶ 269-70)

        After Nurse Mora completed her triage assessment, Gosselin informed Mora that

Viera is deaf, and Mora conveyed that information to Nurse Rose, the emergency department

nurse. (Pltf. R. 56.1 Counterstmt. (Dkt. No. 88) ¶¶ 272-73; Lenza Decl., Ex. 17 (Mora Decl.)

(Dkt. No. 82-16) ¶¶ 12-13) Nurse Rose did not request an ASL interpreter for Viera (Pltf. R.

56.1 Counterstmt. (Dkt. No. 88) ¶ 314), and it is undisputed that RUMC never provided an ASL

interpreter to Viera during the four-and-a-half hours Viera spent at RUMC that evening. (RUMC

R. 56.1 Resp. (Dkt. No. 91) ¶ 369)

        Nurse Rose has submitted a declaration stating that "neither Mr. Gosselin nor Ms.

Viera requested an ASL interpreter," and there is no contrary admissible evidence.[9] (Lenza

Decl., Ex. 18 (Rose Decl.) (Dkt. No. 82-17) ¶¶ 7-8) Rose observed Gosselin "communicate with

Ms. Viera by concurrently speaking to her and moving his hands. I understood Mr. Gosselin was

repeating to Ms. Viera what the hospital staff said to him because I heard Mr. Gosselin repeat the

information aloud when he communicated with Ms. Viera." (Id. ¶¶ 6-7) Based on the

interaction between Gosselin and Viera, Nurse Rose concluded that no sign language interpreter

was necessary:

> My observation of Ms. Viera's non-verbal communication and demeanor did not indicate
> that she did not understand the medical care involving A.G. I did not request an
> interpreter for Ms. Viera as I believed she understood the hospital staff's communications

---

[9] Although Viera testified at her deposition that Gosselin told her that he had requested a sign
language interpreter, and that RUMC personnel had told him that "there were no interpreters
overnight" (June 26, 2017 Wiederhorn Decl., Ex. B (Viera Dep.) (Dkt. No. 78-2) at 65:6-13,
66:20-67:23), as this Court has previously noted, this evidence is hearsay. (See Mem. Op. &
Order (Dkt. No. 118) at 6 n. 6) Moreover, as discussed above, Plaintiff is barred from "offer[ing]
any deposition testimony, affidavit, or other evidence from Plaintiff Gosselin to support her
claims, whether in motion practice or at trial." (Order (Dkt. No. 116) at 14)

through Mr. Gosselin based on her non-verbal communication and demeanor. Ms. Viera appeared less anxious after receiving communication from Mr. Gosselin.

(Id. ¶ 10)

At 11:15 p.m., Rose scored A.G.'s pain as 10 out of 10. (See Lenza Decl., Ex. S16 (Emergency Dept. Admission Record) (Dkt. No. 86-3) at 2) Rose's notes state that the "infant cries loudly in discomfort when touched/re-positioned," and that Gosselin, Viera, and A.G.'s older siblings were present in the treatment room. (Pltf. R. 56.1 Counterstmt. (Dkt. No. 88) ¶ 275)

At approximately 11:19 p.m., Dr. Kaufman, an RUMC emergency room physician, examined A.G. (Pltf. R. 56.1 Counterstmt. (Dkt. No. 88) ¶¶ 275, 277), and at 11:27 p.m., a Level 2 Pediatric Trauma code was initiated, which mobilized trauma surgeons to evaluate A.G.[10] (Id. ¶¶ 278-79) Dr. Kaufman's notes indicate that A.G. was "seen immediately upon arrival [in the Emergency Department] because of [a] high probability of imminent or life threatening deterioration in [his] condition." (Lenza Decl., Ex. 16 (RUMC Physician Notes) (Dkt. No. 82-15) at 9; Lenza Decl., Ex. 3 (Kaufman Decl.) (Dkt. No. 82-3) ¶ 13)

Nurse Rose's notes reflect that, at 11:30 p.m., A.G. was still crying loudly, that Viera was trying to console the baby, and that "father [(Gosselin) was] also present & signs to mother to keep her informed of status." (Pltf. R. 56.1 Counterstmt. (Dkt. No. 88) ¶ 282) The

---

[10] Dr. Kaufman testified that A.G. was assigned a Level 2 trauma code based "[m]ostly [on] the risk factor and the story. So, the risk factor is a four-month old baby has a lot of vulnerabilities in terms of traumatic injury. . . . So, that, coupled with the description of the injury, which is – a grown man falling on the baby, more a level 2 trauma." (Wiederhorn Decl., Ex. X (Kaufman Dep.) (Dkt. No. 87-5) at 105:4-23) Dr. Kaufman further testified that a Level 2 trauma is considered an emergency (id. at 105:24-106:2), and that in such circumstances "medical evaluation of [the] trauma patient is the priority." (Lenza Decl., Ex. 3 (Kaufman Decl.) (Dkt. No. 82-3) ¶ 21)

trauma team and pediatric residents were present at A.G.'s bedside. (Id. ¶¶ 282-83) At this same time, Gosselin executed consents for treatment as to both himself and A.G. (Id. ¶ 284) It is standard emergency department procedure that consent for the treatment of a minor child can be provided by one primary caregiver; no additional consents are required. (Id. ¶ 285)

X-rays of A.G.'s chest and leg were taken between 11:38 p.m. and 12:16 a.m., and the leg x-ray revealed that A.G.'s leg was fractured.[11] (Id. ¶¶ 286-87; see Lenza Decl., Ex. 16 (RUMC Nurse Notes) (Dkt. No. 82-15) at 13)[12] An orthopedic attending physician informed Dr. Kaufman that A.G.'s leg fracture could not be treated at RUMC due to the size of the infant. (Pltf. R. 56.1 Counterstmt. (Dkt. No. 88) ¶ 289) Dr. Kaufman informed Gosselin that A.G.'s leg was broken, that RUMC could not treat him, and that it would be necessary to transfer A.G. to another hospital for treatment. (Id. ¶ 290; Lenza Decl., Ex. 3 (Kaufman Decl.) (Dkt. No. 82-3) ¶¶ 24-25; R & R (Dkt. No. 106), Appendix A at 26 ¶ 12) It is undisputed that Gosselin relayed all of this information to Viera by typing it into Notepad[13] on his cell phone.[14] (Pltf. R. 56.1 Counterstmt. (Dkt. No. 88) ¶¶ 291-92; R & R (Dkt. No. 106), Appendix A at 26 ¶¶ 13-14) Viera

---

[11] Nurse Rose kept Gosselin apprised of the medical procedures and tests that RUMC medical staff were performing on A.G. (RUMC R. 56.1 Resp. (Dkt. No. 91) ¶ 371) Rose believed that Gosselin was relaying these updates to Viera, because she observed him constantly communicating with her. (Wiederhorn Decl., Ex. U (Rose Dep.) (Dkt. No. 87-2) at 133:24-135:23) Viera never requested a piece of paper to write a message to staff, nor did she ever indicate, in any fashion, that she did not understand what was happening. (Id.)

[12] At her deposition, Viera claimed that RUMC doctors "broke [her] son's leg" during the examination in the emergency room. (Wiederhorn Decl., Ex. DD (Viera Dep.) (Dkt. No. 87-12) at 74:19-75:2)

[13] Notepad is a smart-phone application.

[14] Gosselin explained to Viera that A.G. had a broken leg, and would be transferred to a different hospital for treatment, because "RUMC could not take care of A.G." (Pltf. R. 56.1 Counterstmt. (Dkt. No. 88) ¶¶ 291-92; R & R (Dkt. No. 106), Appendix A at 26 ¶¶ 13-14)

has not argued, and has not proffered evidence demonstrating, that she did not understand what Gosselin typed into his phone and showed to her.[15] Nor has Viera argued, or proffered evidence, that she told or indicated in any fashion to RUMC personnel that she did not understand what was happening.

In addition to the communication through Notepad, Dr. Kaufman observed Gosselin signing to Viera, and Viera signing to Gosselin, after Dr. Kaufman relayed information about A.G.'s condition to Gosselin. Dr. Kaufman did not sign to Viera, and he does not understand sign language. But based on the circumstances, he concluded that Gosselin was signing to Viera what Dr. Kaufman had reported to Gosselin about A.G.'s condition. (Lenza Decl., Ex. 3 (Kaufman Decl.) (Dkt. No. 82-3) ¶¶ 26-27; Wiederhorn Decl., Ex. X (Kaufman Dep.) (Dkt. No. 87-5) at 82:5-18) For her part, Viera testified that she communicated with Gosselin at RUMC "about how the baby was doing and [was aware that] he was doing okay." (Wiederhorn Decl., Ex. DD (Viera Dep.) (Dkt. No. 87-12) at 80:21-22) Viera "do[esn't] remember the details" of her conversations with Gosselin, however. (Id.)

It is also undisputed that Dr. Kaufman held up an x-ray of A.G.'s leg to the light, and that Viera observed the x-ray showing the fracture in A.G.'s leg. (R & R (Dkt. No. 106), Appendix A at 27 ¶ 15; Pltf. R. 56.1 Counterstmt. (Dkt. No. 88) ¶ 294) After viewing the x-ray, Viera observed that "[t]he leg bone . . . looked like it was disconnected," and she signed "Wow" to Gosselin." (R & R (Dkt. No. 106), Appendix A at 27 ¶ 16; Pltf. R. 56.1 Counterstmt. (Dkt. No. 88) ¶ 294; Wiederhorn Decl., Ex. DD (Viera Dep.) (Dkt. No. 87-12) at 73:5)

---

[15] To the contrary, Viera testified that she commonly "communicated [with Gosselin] through FaceTime and text," and also through hand gestures and ASL, including on the date of A.G.'s injury. (Wiederhorn Decl., Ex. DD (Viera Dep.) (Dkt. No. 87-12) at 17:20-18:7, 82:21-23, 106:7-10)

Dr. Kaufman states that, "[b]ased on [his] observation of [Viera's] non-verbal reactions[,] . . . [he] believe[d] that she understood A.G.'s leg was broken and [that A.G.] needed to be transferred to another hospital for treatment." (Lenza Decl., Ex. 3 (Kaufman Decl.) (Dkt. No. 82-3) ¶ 28) Dr. Kaufman further testified – based on his observation of Viera's non-verbal conduct – that she "was very active. I mean, she was, she was not sitting there not interacting. She was very active and aware and involved in the situation. . . . [S]he was very involved in the next steps in the decision-making process, and she was not a passive observer of what was happening. She was very concerned about her son and very . . . very interested in what the plan was." (Wiederhorn Decl., Ex. X (Kaufman Dep.) (Dkt. No. 87-5) at 82:15-83:3) At no point during Dr. Kaufman's interactions with Viera and Gosselin did either request an ASL interpreter. (Lenza Decl., Ex. 3 (Kaufman Decl.) (Dkt. No. 82-3) ¶ 34)

An emergency department physician's assistant, Ifeanyi Nwobi, also communicated with Gosselin regarding A.G.'s leg fracture. Nwobi testified that he initially spoke with Gosselin about the incident leading up to the injury, because Gosselin was present when A.G. was injured.[16] (Wiederhorn Decl., Ex. Y (Nwobi Dep.) (Dkt. No. 87-6) at 30:19-32:5) Nwobi also spoke with Gosselin and Viera about treatment options for A.G. (See id. at 32:10-13) Although Nwobi was communicating directly with Gosselin – Gosselin having informed him that Viera was deaf – Nwobi believed that Gosselin was communicating to Viera the information Nwobi was imparting. (Id. at 28:21-24, 32:14-33:11) After Nwobi provided information to Gosselin, Nwobi would pause, wait for Gosselin to communicate the information

---

[16] Nwobi did not speak with Viera about what happened to A.G., because she was not present when A.G. was injured. (Wiederhorn Decl., Ex. Y (Nwobi Dep.) (Dkt. No. 87-6) at 30:19-32:5)

to Viera, and Viera would then nod. (Id. at 32:14-33:11) Gosselin never requested a sign language interpreter. (Id.)

At 1:00 a.m. on December 2, 2014, RUMC sought permission from New York Presbyterian-Weill Cornell Medical Center to transfer A.G. to that institution. (See Pltf. R. 56.1 Counterstmt. (Dkt. No. 88) ¶¶ 321, 324) At 2:00 a.m., Gosselin signed an authorization form for the transfer of A.G. to New York Presbyterian. (Id. ¶ 325) At 3:19 a.m., A.G. was transferred from RUMC to New York Presbyterian. (Id. ¶ 328)

On December 2, 2014, an RUMC employee reported A.G.'s injury to the New York Statewide Central Register of Child Abuse and Maltreatment as a potential case of child abuse. (Mem. Op. & Order (Dkt. No. 118) at 12; Pltf. R. 56.1 Counterstmt. (Dkt. No. 99) ¶¶ 390-91)

## DISCUSSION

### I.  PLAINTIFF'S MOTION FOR RECONSIDERATION

Plaintiff contends that

[t]he Court misapprehended controlling law in the Second Circuit when it articulated Ms. Viera's federally protected as "her right to <u>request</u> the services of an ASL interpreter at RUMC" [quoting Mem. Op. & Order (Dkt. No. 118) at 32 n. 17] and when it oversimplified her right to effective communication as her right to understand "the two key facts[: "A.G. had a broken leg, and he would have to be transferred to another hospital for treatment]." [quoting id. at 34] In fact, as a deaf individual, Ms. Viera's federally protected right under Section 504 is the right to be provided with an appropriate auxiliary aid so that she could effectively communicate during the entire duration of A.G.'s admission to RUMC's emergency department.

(Pltf. Recons. Br. (Dkt. No. 128) at 6) (emphasis in original))

Plaintiff further argues that "[b]ecause Ms. Viera is deaf," RUMC was "obligated to . . . provide her with an accommodation that ensures effective communication." (Id. at 8) "By failing to meet its obligation under the law, RUMC knew or should have known that harm to Ms.

Viera's federally protected right to receive an accommodation was substantially likely." (Id. at 7-8) According to Plaintiff, RUMC therefore had "actual knowledge of discrimination," and it was error for this Court to grant RUMC summary judgment on Plaintiff's Rehabilitation Act Section 504 and NYSHRL claims. (See id.)

In granting RUMC summary judgment, however, this Court never stated that the law required Viera to request an ASL interpreter. The Court merely pointed out that there was evidence in the record that Viera had waived her right to an interpreter on a previous occasion, and instead "opted to proceed with Gosselin as her interpreter." (Mem. Op. & Order (Dkt. No. 118) n. 17) Moreover, this was merely one fact – among ten pages of facts – that this Court discussed in assessing whether RUMC medical staff had exhibited deliberate indifference. (See id. at 30-37)

Likewise, this Court never held that Plaintiff's right to effective communication, under the law, boiled down to whether she understood the "two key facts" regarding A.G.'s medical condition. (See id. at 34) To the contrary, as to the legal standard governing Plaintiff's Section 504 and NYSHRL claims, the Court explained that the "RA requires that 'an otherwise qualified handicapped individual must be provided with meaningful access to the benefit that the grantee offers'" (id. at 26 (quoting Alexander v. Choate, 469 U.S. 287, 301 (1985)), and that the RA's implementing regulations require that a hospital "establish a procedure for effective communication." (Id. (internal quotation marks and citations omitted)) This Court expressly "[a]cknowledg[ed] that RUMC had an obligation to ensure that a deaf person such as Viera [i]s provided with a 'procedure for effective communication,'" but concluded that Plaintiff had "not

produced sufficient evidence to create a material issue of fact as to whether RUMC personnel acted with deliberate indifference." [17] (Id. at 31)

As this Court explained, whether a covered entity has violated the RA by failing to provide a means of effective communication, and whether a plaintiff is entitled to money damages, are two separate inquiries. This is because "'monetary damages are recoverable only upon a showing of an intentional violation.'" (Id. at 27 (quoting Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 275 (2d Cir. 2009) (emphasis in Loeffler))) In order to establish an intentional violation, a plaintiff must demonstrate that the covered entity acted with "deliberate indifference." (See id. at 27-28) Plaintiff collapses these two inquiries into one, and relies on cases which assess whether the covered entity met its obligation to ensure effective communication. A defendant's failure to provide effective communication does not establish a right to money damages, however, and this Court concluded that Plaintiff had not met her burden to establish that RUMC acted with deliberate indifference.

Moreover, and contrary to Plaintiff's argument, Plaintiff cannot obtain money damages here on the basis of mere negligence. (See Pltf. Recons. Br. (Dkt. No. 128) at 8-9, 23, 29 (arguing that RUMC had "actual knowledge," because RUMC "knew or should have known that harm to [Plaintiff's] federally protected right to receive an accommodation was substantially likely" (emphasis added))) A right to money damages is predicated on proof of an "intentional violation." See Loeffler, 582 F.3d at 275 (emphasis in original). Because Plaintiff proffered no

---

[17] Indeed, the Court prefaced its discussion of Plaintiff's federal and NYSHRL claims by explaining that the purpose of the analysis was "to determine whether Viera . . . has presented sufficient evidence to raise a material issue of fact as to whether RUMC personnel 'acted with at least deliberate indifference to the strong likelihood that a violation of [Viera's] federally protected rights [would] result from the [failure to obtain an ASL interpreter for Viera]." (See id. at 31 (quoting Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 275 (2d Cir. 2009))

such proof at summary judgment, this Court properly granted summary judgment to RUMC on Plaintiff's federal and NYSHRL claims.

Because Plaintiff has not (1) pointed to any controlling law or facts – relevant to the deliberate indifference standard – that this Court overlooked, and (2) has not demonstrated that this Court's Memorandum Opinion & Order constitutes clear error, Plaintiff's motion for reconsideration will be denied as to Plaintiff's Rehabilitation Act and NYSHRL claims. Plaintiff's motion will, however, be granted as to Plaintiff's NYCHRL claim, for reasons explained below.

## II.    LEGAL STANDARDS

### A.    Motions for Reconsideration

"Motions for reconsideration are governed by Local Rule 6.3 and are committed to the sound discretion of the district court." Liberty Media Corp. v. Vivendi Universal, S.A., 861 F. Supp. 2d 262, 265 (S.D.N.Y. 2012). "Reconsideration of a previous order by the court is an 'extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources.'" RST (2005) Inc. v. Research in Motion Ltd., 597 F. Supp. 2d 362, 365 (S.D.N.Y. 2009) (quoting In re Health Mgmt. Sys., Inc. Sec. Litig., 113 F. Supp. 2d 613, 614 (S.D.N.Y. 2000) (citations and quotation marks omitted)). "A motion for reconsideration may not be used to advance new facts, issues or arguments not previously presented to the Court, nor may it be used as a vehicle for relitigating issues already decided by the Court." Davidson v. Scully, 172 F. Supp. 2d 458, 461 (S.D.N.Y. 2001) (citing Shrader v. CSX Transp., Inc., 70 F.3d 255, 257 (2d Cir. 1995)). "The major grounds justifying reconsideration are 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'" Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd., 956 F.2d 1245,

1255 (2d Cir. 1992) (quoting 18 C. Wright, A. Miller & E. Cooper, Federal Practice & Procedure § 4478). "To these ends, a request for reconsideration under Rule 6.3 must demonstrate controlling law or factual matters put before the court in its decision on the underlying matter that the movant believes the court overlooked and that might reasonably be expected to alter the conclusion reached by the court." RST (2005) Inc., 597 F. Supp. 2d at 365 (citing Shrader, 70 F.3d at 257).

"[Local] Rule 6.3 is intended to "'ensure the finality of decisions and to prevent the practice of a losing party . . . plugging the gaps of a lost motion with additional matters.'"" Id. (quoting S.E.C. v. Ashbury Capital Partners, L.P., No. 00 Civ. 7898 (RCC), 2001 WL 604044, at *1 (S.D.N.Y. May 31, 2001) (quoting Carolco Pictures, Inc. v. Sirota, 700 F. Supp. 169, 170 (S.D.N.Y. 1988))) (second alteration in original). "A court must narrowly construe and strictly apply Rule 6.3 so as to avoid duplicative rulings on previously considered issues and to prevent Rule 6.3 from being used to advance different theories not previously argued, or as a substitute for appealing a final judgment." Id. (citing Montanile v. Nat'l Broad. Co., 216 F. Supp. 2d 341, 342 (S.D.N.Y. 2002).

**B.    Disability Discrimination Claims Under the Rehabilitation Act and the NYSHRL[18]**

"Under § 504 of the [Rehabilitation Act ("RA")], '[n]o otherwise qualified individual with a disability in the United States, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving [f]ederal financial assistance.'" Loeffler, 582 F.3d at 274-75 (quoting 29 U.S.C. § 794(a)). Because the NYSHRL likewise prohibits disability discrimination, see N.Y. Exec. L. § 296(2), and is construed coextensively with Section 504, see Loeffler, 582 F.3d at 277 (construing NYSHRL disability discrimination claim as coextensive with RA Section 504 and ADA claims); Williams v. City of New York, 121 F. Supp. 3d 354, 364, n. 10 (S.D.N.Y. Aug. 5, 2015) ("[p]rotections afforded by the NYSHRL are construed coextensively with the ADA" and Section 504 of the RA), the Court considers Plaintiff's RA and NYSHRL claims together.[19]

---

[18]  The Complaint also asserts a claim against RUMC under Title III of the ADA (see Cmplt. (Dkt. No. 1) ¶¶ 70-80), but Plaintiff withdrew this claim in her brief opposing RUMC's summary judgment motion. (See Pltf. Br. in Opp. to Sum. J. (Dkt. No. 84) at 9 (Plaintiff "concedes that she is no longer entitled to injunctive relief under Title III [of the ADA]. . . .") Because damages are not an available remedy under Title III of the ADA, see Kreisler v. Second Ave. Diner Corp., 731 F.3d 184, 186 n. 1 (2d Cir. 2013) ("the ADA does not provide for compensatory damages"); Kahn v. New York Univ. Med. Ctr., 328 F. App'x 758, 759 (2d Cir. 2009) ("Appellant could not seek money damages for his ADA claim, however, because Title III authorizes only a suit for injunctive relief." (citing 42 U.S.C. § 12188(a); 42 U.S.C. § 2000a-3(a))); Stebbins v. Legal Aid of Arkansas, 512 F. App'x 662, 663 (8th Cir. 2013) (affirming dismissal of ADA claim, because "Title III of the ADA does not provide for private actions seeking damages" and that was "the sole remedy that [plaintiff] requested")), in conceding that she had no right to injunctive relief, Plaintiff effectively withdrew any claim under Title III of the ADA.

[19]  The parties agree that Plaintiff's NYSHRL claim should be construed coextensively with Plaintiff's federal claims. (See Pltf. Br. in Opp. to Sum. J. (Dkt. No. 84) at 9 ("Conveniently, Title III and Section 504 impose essentially the same standards on covered entities, and the NYHRL is construed coextensively with those federal laws."); Def. Sum. J. Br. (Dkt. No. 81) at

"To establish a <u>prima facie</u> violation of the RA, a plaintiff must show that [he or she] is: (1) a 'handicapped person' as defined in the RA; (2) 'otherwise qualified' to participate in the offered activity or to enjoy its benefits; (3) excluded from such participation or enjoyment solely by reason of his or her handicap; and (4) being denied participation in a program that receives federal financial assistance." <u>Loeffler</u>, 582 F.3d at 275 (quoting <u>Rothschild v. Grottenthaler</u>, 907 F.2d 286, 289-90 (2d Cir. 1990)). In order to establish the third element – the only element contested by RUMC (<u>see</u> Def. Sum. J. Br. (Dkt. No. 81) at 19) – Plaintiff must demonstrate that RUMC did not provide a means of "effective communication" and thus denied her "meaningful access" to RUMC's services. <u>See Loeffler</u>, 582 F.3d at 275; <u>Alexander</u>, 469 U.S. at 301 (The RA requires that "an otherwise qualified handicapped individual must be provided with meaningful access to the benefit that the grantee offers. . . . [T]o assure meaningful access, reasonable accommodations in the grantee's program or benefit may have to be made."); <u>Loye v. Cty. of Dakota</u>, 625 F.3d 494, 500 (8th Cir. 2010) ("the legal standard is effective communication that results in meaningful access").

"[P]roving the failure to provide a means of effective communication, on its own, permits only injunctive relief." <u>Silva v. Baptist Health S. Fla., Inc.</u>, 856 F.3d 824, 831 (11th Cir. 2017) (citation omitted). In order to recover money damages – the remedy Plaintiff seeks here – plaintiff must also establish that the violation was intentional – <u>i.e.</u>, that defendant acted with "at least deliberate indifference to the strong likelihood that a violation of federally protected rights w[ould] result." <u>Loeffler</u>, 582 F.3d at 275 (citing <u>Bartlett v. N.Y. State Bd. of Law Exam'rs</u>, 156

25 ("It is well settled that the State HRL . . . is construed to be co-extensive with their federal counterparts. . . ."))

F.3d 321, 331 (2d Cir. 1998) ("The law is well settled that intentional violations of Title VI, and thus the ADA and the Rehabilitation Act, can call for an award of money damages.")).

### 1.    Effective Communication

"[T]he RA does not ensure equal medical treatment, but does require equal access to and equal participation in a patient's own treatment." Loeffler, 582 F.3d at 275 (citation omitted); Silva, 856 F.3d at 834 ("The ADA and RA focus not on quality of medical care or the ultimate treatment outcomes, but on the equal opportunity to participate in obtaining and utilizing services." (citations omitted)). "It is not dispositive that the patient got the same ultimate treatment that would have been obtained even if the patient were not deaf," because – "regardless of whether a patient ultimately receives the correct diagnosis or medically acceptable treatment" – a patient has still "been denied the equal opportunity to participate in healthcare services whenever he or she cannot communicate medically relevant information effectively with medical staff." Silva, 856 F.3d at 834 (citing 45 C.F.R. § 84.4(b)(2)); Aikins v. St. Helena Hosp., 843 F. Supp. 1329, 1338 (N.D. Cal. 1994) (adequate medical treatment is not a defense to a claim that defendant failed to provide effective communication under the RA). Instead, the proper inquiry is "whether the handicapped patient was afforded auxiliary aids sufficient to ensure a level of communication about medically relevant information substantially equal to that afforded to non-disabled patients." Silva, 856 F.3d at 834. Although the communication required under the RA need not be perfect, it must be effective. Id. at 835 n. 7.

"Under the RA's implementing regulations, a hospital that receives federal funds 'shall establish a procedure for effective communication with persons with impaired hearing for the purpose of providing emergency health care.'" Loeffler, 582 F.3d at 275 (quoting 45 C.F.R. § 84.52(c)). "Additionally, a recipient hospital with fifteen or more employees is required to

'provide appropriate auxiliary aids to persons with impaired sensory, manual, or speaking skills, where necessary to afford such persons an equal opportunity to benefit from the service in question.'" Id. (citing 45 C.F.R. § 84.52(d)(1)). "[A]uxiliary aids may include brailled and taped material, interpreters, and other aids for persons with impaired hearing or vision." 45 C.F.R. § 84.52(d)(3). "[A]ids, benefits, and services, to be equally effective, are not required to produce the identical result or level of achievement for handicapped and nonhandicapped persons, but must afford handicapped persons equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement, in the most integrated setting appropriate to the person's needs." Liese v. Indian River Cty. Hosp. Dist., 701 F.3d 334, 342 (11th Cir. 2012) (quoting 45 C.F.R. § 84.4(b)(2)).

The implementing regulations for Title III of the ADA likewise direct public accommodations – which include hospitals – to "furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities." See 28 C.F.R. §§ 36.303(c)(1), 36.104.[20] This "includes an obligation to provide effective

---

[20] Because "courts treat claims under [the RA and the ADA] identically," Henrietta D. v. Bloomberg, 331 F.3d 261, 272 (2d Cir. 2003), and because both sides treat the RA and the ADA as imposing the same requirements (see Pltf. Br. in Opp. to Sum. J. (Dkt. No. 84) at 9 (relying on ADA regulations to inform analysis of RA claim); Def. Sum. J. Br. (Dkt. No. 81) at 19-20, 22-23 (same)), this Court has considered regulations under both the RA and the ADA in resolving Plaintiff's motion for reconsideration. See, e.g., Silva, 856 F.3d at 829, 833-36 (noting that "ADA and RA claims are governed by the same substantive standard of liability"; analyzing regulations under both Title III of the ADA and the RA to determine whether the defendant met its obligation to ensure effective communication under either statute); Berry-Mayes for Estate of Berry v. New York Health & Hosps. Corp., No. 14 Civ. 9891 (PKC), 2016 WL 8461191, at *4 (S.D.N.Y. Sept. 19, 2016) (considering ADA and RA claims and regulations together, because the "Second Circuit has observed that the ADA and the [RA] contain near-identical requirements" and the "parties have not pointed to any difference in applying the ADA and the [RA] to plaintiff's claims"), aff'd in part sub nom. Berry-Mayes v. New York City Health & Hosps. Corp., 712 F. App'x 111 (2d Cir. 2018); Godbey v. Iredell Mem'l Hosp., Inc., No. 5:12-CV-00004-RLV, 2013 WL 4494708, at *6 (W.D.N.C. Aug. 19, 2013) (same), aff'd, 578 F. App'x 317 (4th Cir. 2014).

communication to companions who are individuals with disabilities." 28 C.F.R. § 36.303(c)(1).

"Companion," in turn, is defined as

> a family member, friend, or associate of an individual seeking access to, or participating in, the goods, services, facilities, privileges, advantages, or accommodations of a public accommodation, who, along with such individual, is an appropriate person with whom the public accommodation should communicate.

28 C.F.R. § 36.303(c)(1)(i). Accordingly, "[d]eaf persons are protected by the ADA and RA not only as patients, but also as companions to patients who are seeking treatment." Silva, 856 F.3d at 830 n. 3, 840 (analyzing whether plaintiff was deprived of his right to effectively communicate where he was acting "as a companion to his father who was suffering a heart attack", rather than a patient).

"'[T]he type of auxiliary aid or service necessary to ensure effective communication will vary in accordance with' several context-specific factors, including the 'nature, length, and complexity of the communication involved; and the context in which the communication is taking place.'" Silva, 856 F.3d at 836 (quoting 28 C.F.R. §§ 36.303(c)(1)(ii)). "A public accommodation should consult with individuals with disabilities whenever possible to determine what type of auxiliary aid is needed to ensure effective communication, but the ultimate decision as to what measures to take rests with the public accommodation, provided that the method chosen results in effective communication." 28 C.F.R. § 36.303(c)(ii). Accordingly, "[i]f effective communication under the circumstances is achievable with something less than an on-site interpreter, then the hospital is well within its ADA and RA obligations to rely on other alternatives." Silva, 856 F.3d at 836.[21]

---

[21] Under Title III of the ADA, the term "auxiliary aid" is defined to include:

> (1) Qualified interpreters on-site or through video remote interpreting (VRI) services; notetakers; real-time computer-aided transcription services; written materials; exchange

ADA regulations further provide that a covered entity "shall not rely on an adult

accompanying an individual with a disability to interpret or facilitate communication," except:

> (i) In an emergency involving an imminent threat to the safety or welfare of an individual
> or the public where there is no interpreter available; or

> (ii) Where the individual with a disability specifically requests that the accompanying
> adult interpret or facilitate communication, the accompanying adult agrees to provide
> such assistance, and reliance on that adult for such assistance is appropriate under the
> circumstances.

28 C.F.R. § 36.303(c)(3)(i)-(ii).

Given the context-specific nature of the inquiry into effective communication, the

question of "'whether an entity subject to the RA has provided appropriate auxiliary aids where

necessary'" is ordinarily "'inherently fact-intensive.'" Silva, 856 F.3d at 836 (quoting Liese, 701

F.3d at 342)); Durand v. Fairview Health Servs., No. 17-1374, 2018 WL 4201971, at *4 (8th Cir.

Sept. 4, 2018) ("[T]he meaningful access standard necessitates a fact-intensive inquiry and is

---

> of written notes; telephone handset amplifiers; assistive listening devices; assistive
> listening systems; telephones compatible with hearing aids; closed caption decoders;
> open and closed captioning, including real-time captioning; voice, text, and video-based
> telecommunications products and systems, including text telephones (TTYs),
> videophones, and captioned telephones, or equally effective telecommunications devices;
> videotext displays; accessible electronic and information technology; or other effective
> methods of making aurally delivered information available to individuals who are deaf or
> hard of hearing;

> (2) Qualified readers; taped texts; audio recordings; Brailled materials and displays;
> screen reader software; magnification software; optical readers; secondary auditory
> programs (SAP); large print materials; accessible electronic and information technology;
> or other effective methods of making visually delivered materials available to individuals
> who are blind or have low vision;

> (3) Acquisition or modification of equipment or devices; and

> (4) Other similar services and actions.

28 C.F.R. § 36.303(b).

largely context-dependent. As such, courts must identify the hearing-abled peer group, as well as the context of the hospital visit, in order to determine whether the hearing-impaired individuals were provided an equal opportunity to access the same benefits." (internal citations omitted)).

## 2. **Deliberate Indifference**

Even where a plaintiff has established that a covered entity violated the RA by failing to ensure effective communication, a plaintiff is not entitled to monetary damages absent a showing of an "intentional violation." See Loeffler, 582 F.3d at 275 (emphasis in original); Bartlett, 156 F.3d at 331 (In order to recover monetary damages, a plaintiff must establish "discriminatory intent within the meaning of the ADA and the Rehabilitation Act" by demonstrating that there was an intentional violation.).

"The standard for intentional violations is 'deliberate indifference to the strong likelihood [of] a violation:' '[i]n the context of the Rehabilitation Act, intentional discrimination against the disabled does not require personal animosity or ill will." Loeffler, 582 F.3d at 275 (quoting Bartlett, 156 F.3d at 331); see also Liese, 701 F.3d at 345 ("[A] plaintiff may demonstrate discriminatory intent [within the meaning of Section 504 of the RA] through a showing of deliberate indifference."). Extrapolating from the Supreme Court's reasoning concerning an implied damages remedy in the Title IX context, the Second Circuit has explained that a defendant acts with deliberate indifference where: (1) an official or "policymaker" who – at a minimum – "has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf", (2) has "actual knowledge of discrimination" against an individual with a disability, and (3) "fails [to] adequately respond." Id. at 275-76 (quoting Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 290 (1998)); Berry-Mayes v. New York

City Health & Hosps. Corp., 712 F. App'x 111, 112 (2d Cir. 2018) (same). "[D]eliberate

indifference must be a 'deliberate choice[,] rather than negligence or bureaucratic inaction.'"

Loeffler, 582 F.3d at 276 (citation omitted)); see also A.G. v. Lower Merion Sch. Dist., 542 F.

App'x 194, 198-99 (3d Cir. 2013) ("'Deliberate indifference requires actual knowledge;' thus,

'allegations that one would have or 'should have known' will not satisfy the knowledge prong of

deliberate indifference.' . . . It . . . require[s] a 'deliberate choice, rather than negligence or

bureaucratic inaction.'" (emphasis in original) (quoting S.H. ex rel. Durrell v. Lower Merion

Sch. Dist., 729 F.3d 248, 266 n. 26 (3d Cir. 2013))); Liese, 701 F.3d at 344 ("deliberate

indifference plainly requires more than gross negligence" and "requires that the indifference be a

'deliberate choice,' which is an "exacting standard'" (citing Loeffler, 582 F.3d at 276; Doe v.

Sch. Bd. of Broward Cty., Fla., 604 F.3d 1248, 1259 (11th Cir. 2010))).

The deliberate indifference standard reflects a balance between effectuating the

remedial goals of the RA and ensuring that the notice and opportunity requirements of Spending

Clause legislation are met. See Liese, 701 F.3d at 347. As the Liese court explained,

> [b]ecause of the similarities between Title IX and the RA, Gebser's purpose-and-scope
> reasoning applies with similar force to the RA and yields the same result. The two
> principal purposes of Title IX that were outlined in Gebser – to avoid the use of Federal
> funds to support discriminatory practices and to protect citizens against discriminatory
> practices – are shared by § 504 of the RA. See S. Rep. 93–1297, at 1 (1974), reprinted in
> 1974 U.S.C.C.A.N. 6373, 6390–91. The legislative history of the RA also shows that
> Congress intended for § 504 to combat intentional discrimination in general, not just
> discrimination resulting from "invidious animus." See Alexander v. Choate, 469 U.S.
> 287, 295, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985). Additionally, like Title IX, Congress
> enacted the RA under its Spending Clause power. Thus, we are presented with the same
> balancing act that the Supreme Court faced in Gebser. . . .The deliberate indifference
> standard best reflects the purposes of § 504 while unambiguously providing the notice-
> and-opportunity requirements of Spending Clause legislation. A lower standard would
> fail to provide the notice-and-opportunity requirements to RA defendants, while a higher
> standard – requiring discriminatory animus – would run counter to congressional intent as
> it would inhibit § 504's ability to reach knowing discrimination in the absence of animus.
> See Alexander, 469 U.S. at 295, 105 S.Ct. 712.

Moreover, application of the deliberate indifference standard does not exceed the scope of express remedies available for § 504 violations. While the RA itself does not contain any express remedies for § 504 violations, again, it expressly incorporates Title VI's remedies. See 29 U.S.C. § 794a(a)(2). Title VI's remedial scheme, which mirrors Title IX's, also empowers administrative agencies to bring enforcement proceedings against entities. See 42 U.S.C. § 2000d–1. The notice-and-opportunity requirements in Title VI administrative enforcement proceedings are the same as those found in Title IX. See id. The deliberate indifference standard is fully consonant with these notice-and-opportunity requirements.

Id. at 347.

Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, and Berry-Mayes v. New York City Health & Hospitals Corp., 712 F.App'x 111, illustrate application of the deliberate indifference standard.

In Loeffler, the Second Circuit considered whether the defendant hospital had acted with "deliberate indifference" in failing to secure an ASL interpreter for Robert Loeffler, a deaf patient. Loeffler, 582 F.3d at 274-75. Loeffler was admitted to the Hospital in 1991 for heart surgery. He requested an ASL interpreter, but none was provided, and his 12 and 9 year old children interpreted for their father. Id. at 271. In 1995, Loeffler was admitted to the Hospital again, this time for an operation on his right carotid artery. "In the days and weeks leading up to the surgery, the Loefflers made numerous attempts to secure an interpreter from the Hospital," but none was provided, even though it was the Hospital's written policy to provide a sign language interpreter when a patient deemed an interpreter necessary for effective communication. Id. at 271-73. After his surgery, Loeffler suffered a stroke, which required an additional surgery. Id. at 272. During the remainder of his hospital stay, plaintiffs made "constant requests" for an interpreter, but none was provided. Id. at 272-73.

In reversing the district court's grant of summary judgment to the defendant hospital, the Loeffler court found that disputed issues of material fact existed concerning plaintiffs' deliberate indifference claim. The court noted plaintiffs' repeated requests for an

accommodation, and the hospital's failure to respond: plaintiffs had made "at least four separate attempts to secure an interpreter in the days and weeks leading up" to the first surgery, "continual requests" during Loeffler's subsequent hospitalization in connection with his stroke, and "several requests for a TTY device" – a machine "which allows the deaf to communicate (by phone or in person) with people with normal hearing, through a relay service." Id. at 272, 276-77. All of these requests went unheeded. Id. "Perhaps most indicative [of deliberate indifference]" was testimony that a physician – "arguably a policymaker" – dismissed plaintiffs' request for an interpreter by "laugh[ing] it off, and play[ing] it as a joke.'" Id. at 276-77. The Second Circuit concluded that while (1) the Hospital's general policy of providing ASL interpreters, and (2) a patient representative's efforts to secure an interpreter on the day of the surgery – although unsuccessful – could support a conclusion that the hospital was not deliberately indifferent, plaintiffs' numerous unheeded requests for an interpreter coupled with "the obvious shortcomings in the [Hospital's] policy and the Hospital's conduct, as well as the alleged apathetic response of Dr. Sithian, notwithstanding his authority to correct the discrimination, could lead a reasonable jury to conclude that the Hospital was deliberately indifferent; and its indifference to [plaintiffs'] rights may have been so pervasive as to amount to a choice." Id. In other words, "a reasonable jury could conclude that persons at the Hospital had actual knowledge of discrimination against [plaintiffs], had authority to correct the discrimination, and failed to respond adequately." Id. at 276.

By contrast, in Berry-Mayes, the Second Circuit upheld a grant of summary judgment to defendant on plaintiff's deliberate indifference claim, concluding that "there is no evidentiary basis for finding that the failure to provide [an interpreter] was based on [the

hospital's] deliberate indifference to [plaintiff's] needs." Berry-Mayes v. New York City Health & Hosps. Corp., 712 F. App'x 111, 112 (2d Cir. 2018).

In Berry-Mayes, plaintiff brought claims on behalf of her deceased uncle – Andre Berry – against two hospitals. Over a two year period, Andre Berry had had multiple hospital stays for conditions that included end-stage renal failure, diabetes, hypertension, and HIV. See Berry-Mayes for Estate of Berry v. New York Health & Hosps. Corp., No. 14 Civ. 9891 (PKC), 2016 WL 8461191, at *1 (S.D.N.Y. Sept. 19, 2016). The evidence demonstrated that the defendant hospital had a policy of providing sign-language interpretation services, and when interpreters were not already present at the hospital, they were brought in as needed. Id. at *11. Berry was provided with an interpreter on fourteen occasions. Berry-Mayes, 712 F. App'x at 112; see also Berry-Mayes, 2016 WL 8461191, at *11 ("When [Berry's sister] requested an interpreter, one was provided about 90 minutes later.").

There were occasions on which the hospital did not provide an interpreter. On these occasions, "hospital staff thoroughly and meticulously documented Andre Berry's communication abilities." Berry-Mayes, 712 F. App'x at 112. Moreover, "[a]lthough the parties dispute[d] the extent to which . . . Berry could communicate by reading lips or using his hearing aid, it [wa]s undisputed that he had at least some ability to communicate other than through sign language." Id. Indeed, Berry's family members communicated with him verbally and through gestures. Id. Given this evidence, the Second Circuit ruled that plaintiff "could not succeed on a claim for compensatory damages." Id. In doing so, the court distinguished Loeffler, noting that that case presented a triable issue of fact as to deliberate indifference based on "evidence that [the] hospital ignored, and, in some instances 'laughed off' numerous requests over an eleven-day period to provide a sign-language interpreter for a deaf patient." Id.

## III.    ANALYSIS

### A.    Plaintiff's Rehabilitation Act and NYSHRL Claims

Plaintiff argues that the Court overlooked controlling law regarding the nature of her "federally protected right," and erred in concluding that no reasonable jury could find that RUMC acted with deliberate indifference. (Pltf. Recons. Br. (Dkt. No. 128) at 6-7; see also Mem. Op. & Order (Dkt. No. 118) at 30-31) Plaintiff contends that – under the regulatory scheme – she was not required to request an ASL interpreter or to put RUMC on notice of her need for an accommodation, because RUMC hospital personnel were aware that Plaintiff was deaf. (Pltf. Recons. Br. (Dkt. No. 128) at 9-15) According to Plaintiff, RUMC therefore had an affirmative obligation to provide Plaintiff with an accommodation and/or engage in an "interactive process" with Plaintiff to determine what accommodations were necessary for her to effectively communicate. (Id. at 9 n. 3, 9-13) By failing to meet this affirmative obligation, Plaintiff argues that RUMC "knew or should have known that harm to [Plaintiff's] federally protected right to receive an accommodation was substantially likely." (Id. at 7-8)

As noted above, however, Plaintiff's argument conflates (1) the standard for finding a violation of the Rehabilitation Act – whether the public accommodation met its obligation to ensure effective communication with an individual with a disability – with (2) the standard for an award of monetary damages, which requires evidence of an intentional violation, which – in turn – is shown by demonstrating "deliberate indifference." Establishing the absence of effective communication is necessary – but not sufficient – to justify an award of monetary damages. See, e.g., Loeffler, 582 F.3d at 275 ("[M]onetary damages are recoverable only upon a showing of an intentional violation." (emphasis in original)); Silva, 856 F.3d at 831 ("[P]roving the failure to provide a means of effective communication, on its own, permits only injunctive

relief. . . . To recover monetary damages, a disabled person must further show that the hospital was deliberately indifferent to her federally protected rights."); Biondo v. Kaleida Health, No. 15 Civ. 362 (FPG) (LGF), 2018 WL 1726533, at *4 (W.D.N.Y. Apr. 10, 2018) ("To receive monetary damages under the RA, a plaintiff must show that (1) the healthcare entity violated her rights under the RA, and (2) that the entity did so with discriminatory intent." (citation omitted)). By collapsing these two independent inquiries, Plaintiff effectively seeks to eliminate the discriminatory intent element and to convert the deliberate indifference standard into a strict liability or negligence standard. That is not the law.

Most of the cases Plaintiff relies on (see Pltf. Recons. Br. (Dkt. No. 128) at 9-10, 13-15) are not on point, because they address whether the defendant failed to provide a reasonable accommodation that ensured effective communication, as opposed to whether the defendant acted with "deliberate indifference." See, e.g., Rothschild v. Grottenthaler, 907 F.2d 286, 289 (2d Cir. 1990) (for purposes of claim for injunctive relief, analyzing whether school district violated the ADA and RA by failing to provide sign language interpreter services for school activities, despite numerous requests for interpreters); Silva, 856 F.3d at 836, 841-42 (holding that plaintiff had "offered sufficient evidence for a rational jury to find that Defendants' failure to offer appropriate auxiliary communication aids impaired her ability to exchange medically relevant information with hospital staff"; remanding to the district court to determine whether defendant was entitled to summary judgment on deliberate indifference grounds); Chisolm v. McManimon, 275 F.3d 315, 327-28 (3d Cir. 2001) (reversing district court's grant of summary judgment, because plaintiff "presented evidence sufficient to raise genuine issues of material fact regarding the effectiveness of the alternative aids provided by [the prison]"; not addressing deliberate indifference). These cases say nothing about the standard for assessing

whether a defendant's violation rises to the level of "deliberate indifference" for purposes of a claim for money damages.[22]

This Court agrees that RUMC had an affirmative obligation to ensure that Plaintiff was able to effectively communicate about medically relevant information substantially to the same extent as a mother who did not suffer from a hearing disability. See Silva, 856 F.3d at 835; Durand, 2018 WL 4201971, at *4. But even assuming arguendo that RUMC did not meet that standard, that failure is not sufficient – standing alone – to justify an award of money damages. Plaintiff was required to also offer evidence demonstrating that RUMC acted with deliberate indifference. This Court concluded that Plaintiff had "not produced sufficient evidence to create a material issue of fact as to whether RUMC personnel acted with deliberate indifference." (See Mem. Op. & Order (Dkt. No. 118) at 31)

Plaintiff argues, however, that this Court erred in granting RUMC summary judgment on deliberate indifference grounds, because (1) RUMC staff knew Plaintiff was deaf;

---

[22] Many of the cases cited by Plaintiff also involve analysis of ADA requirements and regulations applicable in the employment context. Those requirements and regulations are not at issue here. See, e.g., Reed v. LePage Bakeries, Inc., 244 F.3d 254, 260-61 (1st Cir. 2001) (discussing the ADA's requirements and regulations governing employer's provision of reasonable accommodations for employee); Taylor v. Principal Fin. Grp., Inc., 93 F.3d 155, 164 (5th Cir. 1996) ("Where the disability, resulting limitations, and necessary reasonable accommodations, are not open, obvious, and apparent to the employer, as is often the case when mental disabilities are involved, the initial burden rests primarily upon the employee, or his health-care provider, to specifically identify the disability and resulting limitations, and to suggest the reasonable accommodations."); Rosso v. PI Mgmt. Assocs., L.L.C., No. 02 Civ. 1702 (KNF), 2005 WL 3535060, at *11 (S.D.N.Y. Dec. 23, 2005) ("'In general . . . it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed.' However, the notice requirement may be waived where the plaintiff's disability is "obvious or otherwise known to the employer without notice from the employee." (citations omitted)); Felix v. New York City Transit Auth., 154 F. Supp. 2d 640, 653-57 (S.D.N.Y. 2001) (discussing legal standard for establishing discriminatory discharge by employer under the ADA). Moreover, all of these cases were decided before Loeffler, and contain no mention of the deliberate indifference standard. These cases are therefore inapposite.

(2) Dr. Kaufman – as Associate Director of RUMC's emergency department – had authority to "correct the discrimination"; and (3) RUMC staff failed to offer or provide Plaintiff with an interpreter. (Pltf. Recons. Br. (Dkt. No. 128) at 27-28) Plaintiff argues, in essence, that RUMC's knowledge of Plaintiff's deafness coupled with RUMC's failure to provide an interpreter is all that is required to establish that RUMC exhibited deliberate indifference. (See id.) Were Plaintiff's argument accepted, negligence would be sufficient to establish a deliberate indifference claim. (See id. at 8, 23, 29 (arguing that RUMC "knew or should have known that harm to [Plaintiff's] federally protected right to receive an accommodation was substantially likely" (emphasis added)))

The Second Circuit and other courts have uniformly rejected efforts to impose liability on the basis of mere negligence, however. See, e.g., Loeffler, 582 F.3d at 276 ("[D]eliberate indifference must be a 'deliberate choice[,] rather than negligence or bureaucratic inaction.'"); Berry-Mayes, 712 Fed. App'x at 112 (same); Lower Merion Sch. Dist., 542 F. App'x at 198-99 ("[A]llegations that one would have or 'should have known' will not satisfy the knowledge prong of deliberate indifference.' . . . It . . . require[s] a 'deliberate choice, rather than negligence or bureaucratic inaction.'" (citation omitted)); McCullum v. Orlando Reg'l Healthcare Sys., Inc., 768 F.3d 1135, 1147 (11th Cir. 2014) (deliberate indifference is an "'exacting standard,' which requires showing more than gross negligence" (citations omitted)); Duvall v. Cty. of Kitsap, 260 F.3d 1124, 1138-40 (9th Cir. 2001) ("Because in some instances events may be attributable to bureaucratic slippage that constitutes negligence rather than deliberate action or inaction, we have stated that deliberate indifference does not occur where a duty to act may simply have been overlooked, or a complaint may reasonably have been deemed to result from events taking their normal course. . . . [I]n order to meet the . . . deliberate

35

indifference test, a failure to act must be a result of conduct that is more than negligent, and involves an element of deliberateness."); see also Nordwall v. PHC-LAS Cruces, Inc., 960 F. Supp. 2d 1200, 1229 (D.N.M. 2013) ("Negligence, even if gross, cannot constitute deliberate indifference."). Deliberate indifference requires "actual knowledge of discrimination." See, e.g., Loeffler, 582 F.3d at 276; Lower Merion Sch. Dist., 542 F. App'x at 198-99; Liese, 701 F.3d at 349.

Accordingly, knowledge that an individual has a disability and a failure to offer an accommodation is not sufficient to establish deliberate indifference. A plaintiff must instead demonstrate a failure to act in the face of actual knowledge that the disabled individual requires an interpretative aid to effectively communicate, under such circumstances where the level of indifference is "so pervasive as to amount to a choice." See, e.g., Loeffler, 582 F.3d at 276-77; McCullum, 768 F.3d at 1148 (no deliberate indifference where the attending physician believed he was effectively communicating with the deaf patient, the deaf patient was nodding and indicating that he understood, the deaf patient's mother did not indicate that her knowledge of sign language was inadequate or that she felt unqualified to interpret for her son, and neither the deaf patient nor his family members requested an interpreter);[23] Liese, 701 F.3d at 351-52 (evidence supported finding of deliberate indifference where deaf patient told the doctor that her ability to read lips was limited, the doctor laughed at her "and made exaggerated facial movements" when asking her if she could read lips, the deaf patient twice requested an

---

[23] Plaintiff's argument that McCullum was abrogated by Silva, 856 F.3d 824 (see Pltf. Recons. Br. (Dkt. No. 128) at 18-19), is incorrect. Silva addresses only effective communication and expressly declines to reach the issue of deliberate indifference, which was remanded to the district court. Silva, 856 F.3d at 841. Indeed, on remand, the district court granted defendant summary judgment on grounds of deliberate indifference, finding that plaintiff had demonstrated no more than negligence. See Silva v. Baptist Health S. Fla., Inc., 303 F. Supp. 3d 1334, 1342 (S.D. Fla. 2018)

interpreter and the doctor ignored her requests, and in response to her question regarding why she needed surgery on her stomach, the doctor wrote, "remove it and you'll feel better"); Duvall, 260 F.3d at 1140 (finding deliberate indifference where plaintiff repeatedly requested certain accommodations, defendants did not investigate whether such accommodations were available, plaintiff made clear that the existing accommodations were inadequate with respect to his disability, and defendants failed to respond); Girard v. Lincoln Coll. of New England, 27 F. Supp. 3d 289, 300 (D. Conn. 2014) (finding deliberate indifference where plaintiff complained, on multiple occasions, that the test-taking environment provided was too loud, and defendants made various dismissive statements in response, including "'You didn't study' and 'you obviously weren't putting your effort into it'"); Silva, 303 F. Supp. 3d at 1341 (no deliberate indifference where the record "contain[ed] no indication . . . that Defendants were actually aware of any instance in which they communicated ineffectively with Plaintiffs[,]" and there [wa]s no evidence that Plaintiffs ever complained to or informed Defendants that they were not receiving proper assistance"); Godbey v. Iredell Mem'l Hosp., Inc., No. 5:12-CV-00004-RLV, 2013 WL 4494708, at *6 (W.D.N.C. Aug. 19, 2013) ("[Q]ualifying defendants are not required as a matter of course to provide ASL interpreters, and such defendants are not required 'to guess' a plaintiff's need for reasonable accommodations. . . . [C]omplicating Plaintiff's requests for relief is his perceived entitlement to an ASL interpreter merely upon providing hospital staff with notice of his deafness. . . . Plaintiff made remarkably little effort to put hospital staff on notice of their alleged communicative deficiencies[, however.] . . . Defendant . . . cannot be held liable for monetary damages under the Rehabilitation Act."), aff'd, 578 F. App'x 317 (4th Cir. 2014).[24]

---

[24] McCoy v. Texas Dep't of Criminal Justice, No. C.A.C 05 370, 2006 WL 2331055, at *7 (S.D. Tex. Aug. 9, 2006) and O'Neil v. Texas Dep't of Criminal Justice, 804 F. Supp. 2d 532, 538 (N.D. Tex. 2011), cited by Plaintiff (see Pltf. Recons. Br. (Dkt. No. 128) at 9, 21), are not

Here, RUMC had a policy of providing free sign language interpretation services, and provided sign language interpreter services on demand when needed. (See Lenza Decl., Ex. 5 (RUMC Policy) (Dkt. No. 82-5) at 2; Pltf. R. 56.1 Counterstmt. (Dkt. No. 88) ¶¶ 222, 236; Lenza Decl., Ex. 3 (Kaufman Decl.) (Dkt. No. 82-3) ¶ 6) Indeed, it is undisputed that RUMC provided Plaintiff with an interpreter on at least one occasion prior to her December 1, 2014 hospital visit, and that RUMC offered Plaintiff an ASL interpreter three months before her December 1, 2014 hospital visit, when she arrived at the hospital to give birth. (See Pltf. R. 56.1 Stmt. (Dkt. No. 88) ¶¶ 246-47, 251; Lenza Decl., Ex. 8 (Viera Dep.) (Dkt. No. 82-8) at 33:15-18; Lenza Decl., Ex. 12 (Refusal of Language Services Form) (Dkt. No. 82-11) at 4) On the latter occasion, Plaintiff signed a refusal of Language Assistance Services form, expressing her preference to have Gosselin interpret for her. (See Pltf. R. 56.1 Counterstmt. (Dkt. No. 88) ¶¶ 246-47; Lenza Decl., Ex. 12 (Refusal of Language Services Form) (Dkt. No. 82-11) at 3)

It is also undisputed that A.G. was assigned a Level 2 trauma code by RUMC medical staff shortly after his arrival at RUMC, due to a risk of imminent or life threatening deterioration in his medical condition, (see Pltf. R. 56.1 Counterstmt. (Dkt. No. 88) ¶¶ 266-67, 278-79; Lenza Decl., Ex. 3 (Kaufman Decl.) (Dkt. No. 82-3) ¶ 15), and that Plaintiff was not present when the injury to A.G. occurred. (Pltf. R. 56.1 Counterstmt. (Dkt. No. 88) ¶ 256) Under these circumstances, RUMC "had to make immediate, time-sensitive decisions. In these types of situations, [one would] expect [RUMC] to prioritize conversations" with Gosselin, who

---

persuasive here. In contrast to the Second Circuit and all of the other circuits to address the legal standard for imposition of monetary damages, the Fifth Circuit has rejected the deliberate indifference standard. See Delano-Pyle v. Victoria Cty., Tex., 302 F.3d 567, 575 (5th Cir. 2002) ("There is no 'deliberate indifference' standard applicable to public entities for purposes of the ADA or the RA."). Accordingly, McCoy and O'Neil reflect a legal standard that this Circuit has rejected.

caused A.G.'s injury. See Durand, 2018 WL 4201971, at *4. Indeed, Physician Assistant Nwobi testified that when he was first assigned A.G.'s case, he primarily spoke with Gosselin, because Gosselin was present when A.G. was injured. (Wiederhorn Decl., Ex. Y (Nwobi Dep.) (Dkt. No. 87-6) at 30:19-32:5) Although Plaintiff – as A.G.'s mother – had a right to be involved in the decisions regarding A.G.'s treatment plan, RUMC staff's prioritization of conversations with Gosselin does not, under the circumstances, support a finding of deliberate indifference.

Moreover, Dr. Kaufman and Nurse Rose – the primary RUMC employees who interacted with Plaintiff and Gosselin – believed that they were effectively communicating with Plaintiff, who was an active presence in the emergency room. (See Lenza Decl., Ex. 3 (Kaufman Decl.) (Dkt. No. 82-3) ¶ 27 (Dr. Kaufman "observed Mr. Gosselin signing to Ms. Viera after [Dr. Kaufman] spoke[,] which [Dr. Kaufman] understood was Mr. Gosselin advising Ms. Viera what [Kaufman] said"); Wiederhorn Decl., Ex. X (Kaufman Dep.) (Dkt. No. 87-5) at 82:15-83:3 (testifying that Viera "was very active. I mean, she was, she was not sitting there not interacting. She was very active and aware and involved in the situation."); Lenza Decl., Ex. 18 (Rose Decl.) (Dkt. No. 82-17) ¶¶ 6-7, 10 (Rose observed Gosselin "communicate with Ms. Viera by concurrently speaking to her and moving his hands," "understood [that] Mr. Gosselin was repeating to Ms. Viera what the hospital staff said to him," and "believed [that Viera] understood the hospital staff's communications through Mr. Gosselin based on her non-verbal communication and demeanor.")) Physician Assistant Nwobi likewise believed that Gosselin was communicating the information that he told Gosselin to Viera, because after he communicated information to Gosselin, Gosselin would communicate with Plaintiff, and Nwobi observed Plaintiff "nod." (See Wiederhorn Decl., Ex. Y (Nwobi Dep.) (Dkt. No. 87-6) at 28:21-24, 32:14-33:11)

Given that Gosselin and Plaintiff appeared at the hospital as husband and wife –

and had together brought their four-month-old son to RUMC for treatment – Dr. Kaufman, Nurse

Rose, and Physician Assistant Nwobi had no reason to believe that Gosselin's communication

with Viera would be ineffective. To the contrary, the interaction between the two suggested

otherwise.

There is also no evidence that Gosselin or Plaintiff requested an ASL interpreter

while at RUMC, or that they "did anything to disabuse the [RUMC] staff of their allegedly

mistaken belief that the staff was communicating effectively with [Plaintiff]." See McCullum,

768 F.3d at 1148. Nurse Rose, Dr. Kaufman, and Physician Assistant Nwobi all testified that

neither Gosselin nor Viera requested an ASL interpreter or indicated that Viera did not

understand what was taking place. (See Lenza Decl., Ex. 18 (Rose Decl.) (Dkt. No. 82-17) ¶ 8

("[N]either Mr. Gosselin nor Ms. Viera requested an ASL interpreter."); Wiederhorn Decl., Ex. U

(Rose Dep.) (Dkt. No. 87-2) at 133:24-135:23 (testifying that Viera never requested a piece of

paper to write a message to staff, or indicated – in any fashion – that she did not understand what

was happening); Lenza Decl., Ex. 3 (Kaufman Decl.) (Dkt. No. 82-3) ¶ 34 (stating that he is

"confident that neither Mr. Gosselin nor Ms. Viera requested a sign language interpreter");

Wiederhorn Decl., Ex. Y (Nwobi Dep.) (Dkt. No. 87-6) at 32:20-22 (testifying that Gosselin

never requested a sign language interpreter))

As in Berry-Mayes, "[a]lthough the parties dispute the extent to which . . .

[Plaintiff] could communicate by reading lips . . . it is undisputed that [s]he had at least some

ability to communicate other than through sign language," and that Plaintiff's "family members

communicated with h[er] [through writing]" and gestures. (See Berry-Mayes, 712 F. App'x at

112; Lenza Decl., Ex. 8 (Viera Dep.) (Dkt. No. 82-8) at 17:20-19:3 (testifying that she can read

and write English, and that when Gosselin moved in with her she communicated with him primarily through text and body language); R & R (Dkt. No. 106), Appendix A at 26 ¶ 1 ("Ms. Viera can read and write English.")) Indeed, it is undisputed that the information that Dr. Kaufman communicated to Gosselin was, in fact, communicated to Viera: Gosselin told Plaintiff that A.G.'s leg was broken, that RUMC could not treat him, and that it would be necessary to transfer A.G. to another hospital for treatment. (See Pltf. R. 56.1 Counterstmt. (Dkt. No. 88) ¶¶ 290-92; R & R (Dkt. No. 106), Appendix A at 26 ¶¶ 12-14) It is likewise undisputed that Viera communicated with Gosselin at RUMC "about how the baby was doing" and was aware that "he was doing okay." (Wiederhorn Decl., Ex. DD (Viera Dep.) (Dkt. No. 87-12) at 80:21-22)

Assuming arguendo that RUMC staff's failure to obtain an interpreter, or engage in a dialogue with Plaintiff about what accommodations she required, was negligent, Plaintiff has not raised a material issue of fact as to deliberate indifference. RUMC was properly granted summary judgment on Plaintiff's RA and NYSHRL claims. Plaintiff's motion for reconsideration as to these claims will be denied.

**B      Plaintiff's NYCHRL Claim**

Under the NYCHRL, N.Y.C. Admin. Code, § 8-107, it is

an unlawful discriminatory practice for any person who is the owner, franchisor, franchisee, lessor, lessee, proprietor, manager, superintendent, agent or employee of any place or provider of public accommodation:

1.   Because of any person's actual or perceived . . . disability . . . directly or indirectly:

(a) To refuse, withhold from or deny to such person the full and equal enjoyment, on equal terms and conditions, of any of the accommodations, advantages, services, facilities or privileges of the place or provider of public accommodation . . . .

N.Y.C. Admin. Code, § 8-107(4)(a)(1)(a).

Moreover,

> any person prohibited by the provisions of this section from discriminating
> on the basis of disability shall make reasonable accommodation to enable a
> person with a disability to . . . enjoy the right or rights in question provided
> that the disability is known or should have been known by the covered
> entity.

N.Y.C. Admin. Code, § 8-107 15(a).

While liability for disability discrimination under the RA, the ADA, and the

NYSHRL may be considered together, the Second Circuit has instructed that the NYCHRL

imposes a higher standard that requires courts to construe its provisions "liberally for the

accomplishment of the uniquely broad and remedial purposes [of the NYCHRL]." See Loeffler,

582 F.3d at 278 (quoting N.Y.C. Admin. Code § 8-130)). Although cases construing similar

language in federal and state anti-discrimination statutes may be considered in interpreting, and

determining liability under, the NYCHRL, related federal and state law provisions merely set "a

floor below which the [NYCHRL] cannot fall." Loeffler, 582 F.3d at 278 (emphasis in original)

(citation omitted).

Accordingly,

> courts must analyze NYCHRL claims separately and independently from any federal and
> state law claims, see Restoration Act § 1 [N.Y.C. Local L. No. 85]; Hernandez v.
> Kaisman, 103 A.D.3d 106, 957 N.Y.S.2d 53, 58 (1st Dep't 2012); [Gurian, A Return to
> Eyes on the Prize: Litigating Under the Restored New York City Human Rights Law, 33
> FORDHAM URB. L. J. 225, at 275-77 (2006)], construing the NYCHRL's provisions
> "broadly in favor of discrimination plaintiffs, to the extent that such a construction is
> reasonably possible," Albunio v. City of New York, 16 N.Y.3d 472, 477-78, 922 N.Y.S.2d
> 244, 947 N.E.2d 135 (2011). Thus, even if the challenged conduct is not actionable under
> federal and state law, federal courts must consider separately whether it is actionable
> under the broader New York City standards.

Mihalik v. Credit Agricole Cheuvreux, 715 F.3d 102, 109 (2d Cir. 2013).

Here, through two separate rounds of briefing, Plaintiff has made no effort to cite,

discuss, or analyze any of the pertinent statutory provisions and case law governing disability

discrimination under the NYCHRL. At summary judgment, Plaintiff merely argued, in conclusory fashion, that because Plaintiff had satisfied her burden under the RA, "she has done so under the NYCHRL as well." (Pltf. Opp. (Dkt. No. 84) at 10) And in Plaintiff's brief in support of her motion for reconsideration, Plaintiff devotes two sentences to the NYCHRL. Plaintiff's briefing, in its entirety, reads as follows:

> The Court's conclusion that Ms. Viera "proffered no evidence suggesting that Dr. Kaufman and Nurse Rose realized or should have realized that effective communication with her was not taking place," is clear evidence that the Court misapprehended the deliberate indifference standard. [Mem. Op. & Order (Dkt. No. 118) at 39] Thus, based on the analysis above and because the federal law is a floor and not a ceiling, as further evinced in the city mandates for the immediate provision of interpreters in emergency rooms, the Court's analysis of the NYCHRL was also clear error. See NYC Administrative Code §17-174.

(Pltf. Recons. Br. (Dkt. No. 128) at 29)

For the reasons discussed above, the Court did not "misapprehend" the deliberate indifference standard, as Plaintiff argues. Moreover, the citation to N.Y.C. Admin. Code, §17-174 does not assist Plaintiff. Section 17-174 provides that:

> [t]he board [of health] shall require the immediate provision of interpretation services for non-English speaking residents in all hospital emergency rooms located in New York City, when such non-English speaking residents comprise at least ten percent of the patient population of the service area of a particular hospital.

N.Y.C. Admin. Code, §17-174 (emphasis added). Given that Plaintiff speaks English and that there has been no showing that deaf patients make up ten percent or more of the patient population in Staten Island, Section 17-174 has no application.

RUMC's briefing concerning Plaintiff's NYCHRL claim has likewise been wholly inadequate through two separate rounds of briefing. (See Def. Sum. J. Br. (Dkt. No. 81) at 25 (arguing that RUMC is entitled to summary judgment on Plaintiff's NYCHRL claim but

not providing any legal authority); Def. Br. in Opp. to Recons. (Dkt. No. 123) (not addressing the standard for liability under the NYCHRL)).

Acknowledging the obligation to construe the NYCHRL "liberally," and recognizing the NYCHRL's "uniquely broad and remedial purposes," Plaintiff has proffered no evidence suggesting that – in connection with her December 1, 2014 visit to RUMC – Dr. Kaufman and Nurse Rose "kn[ew] or should have . . . known" that Viera required an accommodation in order to enable her to "enjoy the right[s]" in question – here, RUMC's services. See N.Y.C. Admin. Code, §§ 8-107(4)(a)(1)(a), 8-107 15(a). The plain language of the NYCHRL, even liberally construed, therefore appears to preclude liability, entitling RUMC to summary judgment.

Upon reconsideration of the record, however, and in the absence of appropriate briefing from either side regarding application of the NYCHRL here, this Court concludes that "the appropriate analytic framework to be applied to [Plaintiff's NYCHRL] discrimination claim[] based on a 'disability' as defined by New York . . . municipal law is a question best left to the courts of the State of New York." See Giordano v. City of New York, 274 F.3d 740, 754 (2d Cir. 2001). The Second Circuit has instructed that

> [w]hile the statute governing supplemental jurisdiction, 28 U.S.C. § 1367, does not require dismissal of pendent state-law claims where all of the federal claims have been dismissed, see id. § 1367(c)(3), "if it appears that the state issues substantially predominate, whether in terms of proof, of the scope of the issues raised, or of the comprehensiveness of the remedy sought, the state claims may be dismissed without prejudice and left for resolution to state tribunals." United Mine Workers v. Gibbs, 383 U.S. 715, 726–27, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); see also Seabrook v. Jacobson, 153 F.3d 70, 72 (2d Cir.1998) (noting that it is particularly appropriate for the district court to dismiss where "the federal claim on which the state claim hangs has been dismissed"); Marcus v. AT&T Corp., 138 F.3d 46, 57 (2d Cir.1998) ("In general, where the federal claims are dismissed before trial, the state claims should be dismissed as well.") (citing Purgess v. Sharrock, 33 F.3d 134, 138 (2d Cir. 1994), and Baylis v. Marriott Corp., 843 F.2d 658, 664–65 (2d Cir.1988)). Indeed, we conclude that the state-law claims should be dismissed so that state courts can, if so called upon, decide for

themselves whatever questions of state law this case may present. Cf. Robison v. Via, 821 F.2d 913, 925 (2d Cir.1987) (remarking that it "may be an abuse of the district court's discretion" not to remand state-court claims especially when they involve "novel questions of state law").

Id.

"[B]ecause [the standard for liability under the NYCHRL] ha[s] not been fully briefed and argued and because the law of New York in regard to relative state and federal disability claim analysis is still developing," it is not appropriate for this Court to reach Plaintiff's NYCHRL claim. See Brief v. Albert Einstein Coll. of Med., 423 F. App'x 88, 93 (2d Cir. 2011) (directing that NYCHRL claim be dismissed without prejudice, so that the parties could litigate the appropriate standard for liability in state court should "plaintiff seek to reinstate his . . . city law claim[] in that forum"); Giordano, 274 F.3d at 754-55 ("We see . . . no reason to address [the standard for liability] with regard to the . . . municipal claims, lest we render a decision that does not accurately reflect New York law on the subject."; directing that NYCHRL claim be dismissed "without prejudice so that the state courts may adjudicate those claims in their entirety if the plaintiff chooses to pursue them in those courts"); Berry-Mayes, 2016 WL 8461191, at *12 ("'[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors will point toward declining to exercise jurisdiction over the remaining state-law claims.'" (quoting Kolari v. New York-Presbyterian Hosp., 455 F.3d 118, 119 (2d Cir. 2006))).

Accordingly, Plaintiff's motion for reconsideration is granted as to Plaintiff's NYCHRL law claim, and upon reconsideration, this Court declines to exercise supplemental jurisdiction over Plaintiff's NYCHRL claim. Plaintiff's NYCHRL claim will be dismissed without prejudice "to [it] being brought in an appropriate state forum." See Giordano, 274 F.3d at 755.

## CONCLUSION

For the reasons stated above, Plaintiff's motion for reconsideration is denied as to Plaintiff's Rehabilitation Act and NYSHRL claims, but granted as to Plaintiff's NYCHRL claim. Plaintiff's NYCHRL claim is dismissed without prejudice to it being refiled in a New York state court. The Clerk of Court is directed to terminate the motion (Dkt. No. 127), and to close this case.

Dated: New York, New York
September 30, 2018

SO ORDERED.

Paul G. Gardephe
United States District Judge